The STATE of Ohio, Appellee,

v.

PATTERSON, Appellant.

[Cite as *State v. Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2009 CA 16.

Decided May 7, 2010.

Amy M. Smith, Assistant Prosecuting Attorney, for appellee.

Jeremy J. Masters, Assistant State Public Defender, for appellant.

DONOVAN, Presiding Judge.

{¶ 1} Defendant-appellant, Mahogany Patterson, appeals her conviction and sentence for one count of felony murder, in violation of R.C. 2903.02(B), a felony of the first degree; one count of aggravated robbery, in violation of R.C. 2911.01(A)(3), a felony of the first degree; one count of involuntary manslaughter, in violation of R.C. 2903.04(A), a felony of the first degree; and one count of theft, in violation of R.C. 2913.02(A)(1), a felony of the fifth degree.

{¶ 2} Patterson filed a timely notice of the instant appeal with this court on February 10, 2009.

I

{¶ 3} We set forth the history of the case in *State v. Patterson,* Clark App. No. 05CA0128, 2007-Ohio-29, 2007 WL 29391 (hereinafter *"Patterson I"*), and repeat it herein in part:

{¶ 4} "On the afternoon of June 7, 2005, Defendant Patterson and three other young women, Toneisha Gunnell, Alicia McAlmont and Renada Manns, traveled from Columbus to the Upper Valley Mall in Springfield. McAlmont drove the women to Springfield in her sister's rental car. The four women shared a common criminal purpose, plan or scheme: to steal clothing from stores in the mall, and they all participated in that criminal enterprise. After stealing clothing from the Macy's store, Patterson, Gunnell and McAlmont ran outside to their

waiting getaway vehicle that was parked along the curb in front of the northern set of doors of the Macy's store, leading to the parking lot. The vehicle was parked facing south, facing oncoming traffic as it sat at the curb. Renada Manns was driving the vehicle. When the three women, who by now were being pursued by a Macy's security guard, got inside the vehicle, Manns accelerated rapidly and sped off in order to avoid apprehension.

{¶ 5} "As the four women sped away in their vehicle, a pedestrian, John Deselem, was walking back into the mall from the parking lot, moving toward the southern set of doors into Macy's after retrieving his girlfriend's purse from their car. Deselem apparently saw the security guard running after the fleeing vehicle, and so Deselem stopped, turned, and faced the oncoming vehicle and waived his arms in an effort to stop the vehicle. The vehicle did not stop, however, and it struck Deselem, resulting in fatal injuries. Manns drove off out of the mall parking lot without slowing down or stopping. The vehicle was discovered by police a short time later, not far from the mall, with much of the stolen merchandise yet inside. The next day all four defendants turned themselves in to Columbus police."

{¶ 6} In *Patterson I,* we reversed Patterson's conviction and sentence, finding that the trial court erred when it denied her *Batson* challenge, *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, to the state's use of a peremptory challenge to exclude the only African–American juror seated on the prospective panel. Patterson was tried a second time; however, the trial ended in a mistrial after the discovery of juror misconduct that occurred after the jury began deliberations.

{¶ 7} Following a third jury trial, which began on January 20, 2009, and ended on January 30, 2009, Patterson was found guilty on all of the counts of the indictment.[1] For sentencing purposes, the trial court merged the felony-murder and involuntary-manslaughter counts, as well as the counts for aggravated robbery and theft. On February 3, 2009, the trial court sentenced Patterson to 15 years to life in prison for the felony murder and three years on the aggravated robbery. The court also ordered that Patterson's sentences be served consecutively for an aggregate sentence of 18 years to life in prison.

{¶ 8} It is from this judgment that Patterson now appeals.

---

1. In the third trial, Patterson, Gunnell, and McAlmont were tried together. Manns was not tried with the other defendants and was not involved in the third trial. Manns's testimony from the second trial, however, was read to the jury during the third trial without objection from any of the parties.

## II

{¶ 9} Patterson's first assignment of error is as follows:

{¶ 10} "The trial court erred by failing to grant a mistrial after the jury was erroneously permitted to review and consider prejudicial evidence that was not marked or admitted into evidence during trial. Fifth and Fourteenth Amendments to the United States Constitution; Section 16, Article I, Ohio Constitution."

{¶ 11} In her first assignment, Patterson contends that the trial court erred when it overruled her motion for a mistrial made after the jury informed the trial court that it had received and collectively examined an exhibit that had not been discussed or properly admitted during the third trial. Upon investigation, it was determined that State's Exhibit 227B, which had been marked and identified in Patterson's second trial, had apparently inadvertently been included in a stack of the state's exhibits that were admitted into evidence as a group prior to the beginning of jury deliberations. The following discussion covers what happened upon the court's receipt of this information:

{¶ 12} "The Court: For the record, Counsel is present. The defendants are not present. The jury is not present. The situation came to the attention of the Court that the jurors found an exhibit amidst the voluminous exhibits that were admitted into evidence.

{¶ 13} "They found an exhibit that they believe they shouldn't have, and that exhibit was previously marked State's Exhibit 227B back in 2007 during the second trial.

{¶ 14} "Now, I've had the court reporter go back and review the Court's statements as far as what exhibits would be admitted and originally the court had indicated that it would admit State's Exhibit # 201 through # 254 with the exception of Exhibits # 205 and # 218. At a later time, I believe, when the defense rested or at some later time Mr. Collins brought to the Court's attention and the defense counsel's attention that there was another exhibit or two in that group that should not go back to the jury; and he indicated that those were Exhibits # 226, # 227, and # 227A, I believe, or it may have been # 226 and # 227A; but nevertheless, there was no mention of # 227B.

{¶ 15} "So the Court then renewed its ruling that State's Exhibits # 201 through # 254 would be admitted with the exceptions # 205, # 218, # 226, and # 227A.

{¶ 16} "As I indicated, the exhibit that went back to the jury that wasn't supposed to go back was the exhibit marked in the previous trial, # 227B.

{¶ 17} "So I'm making a finding here that it wasn't that our court reporter forgot to remove # 227B from the collection of exhibits that were supposed to go back to the jury; it was an oversight on the part of everybody involved, the Court and the attorneys, that # 227B was in the midst of those exhibits.

{¶ 18} "And because it was never clearly brought to my attention, I never specifically excluded that. So I believe it was an oversight on all of our parts, as opposed to an error in what exactly went back to the jury and what was supposed to go back and what wasn't supposed to go back."

{¶ 19} State's Exhibit 227B is a Clark County Sheriff's Office form entitled "Official Statement" and consists of a written statement made by a former state's witness, Jennifer Rockwell. The statement reads as follows:

{¶ 20} "[Renada Manns] and [Mahogany Patterson] where [sic] up in pod 3 east laughing about hitting and killing that guy at the mall[.] [T]hey said that fat mother-fucker hit the windshield and rolled off the car[.] [T]hey also stated that [Renada's] sister[']s boyfriend is the one that picked them up when they abanded [sic] their car. [Renada] stated that she was the one driving the car when Mr. Deselem was hit."

{¶ 21} Rockwell testified for the state at Patterson's second trial and her written statement was marked and identified at that time. However, she was not called to testify at the third trial, nor was her statement used during the third trial.

{¶ 22} It is undisputed that State's Exhibit 227B should not have been provided to the jury in Patterson's third trial. After the jury's discovery of State's Exhibit 227B in the stack of admitted exhibits, the jury examined it and discussed it for approximately 45 minutes before alerting the trial court to their discovery.

{¶ 23} Once he became aware that the jury had seen State's Exhibit 227B, the trial judge immediately informed the attorneys for both the state and the defense. The judge also sent the jurors to dinner and removed all of the trial exhibits from the jury room. Patterson's counsel, as well as counsel for the other defendants, moved for an immediate mistrial in light of the highly prejudicial nature of State's Exhibit 227B. Both the state and the trial judge agreed with the defense that the exhibit was prejudicial. The state requested that the court refrain from ruling on the motion for mistrial until it could investigate other possible remedies. The trial judge stated that he would hold the motion for mistrial in abeyance until he had a chance to speak individually with each juror regarding the contents of State's Exhibit 227B.

{¶ 24} Additionally, the state acknowledged the following in regard to Rockwell's statement before the judge questioned the jurors:

{¶ 25} "The State: I would go even further, Your Honor, and indicate that at this stage the State is willing for the Court to say that this was marked at a previous proceeding. *That the State of Ohio investigated this statement and found it to be false. Found it to be a statement by an inmate that was made for—I don't know how you want to phrase it—other than honorable purposes and did* [sic] *that statement, is a false statement; the parties agree it is a false statement* and that the Court—We would certainly agree that the Court could voir dire each and every juror and inquire of them as to whether they can follow the Court's instruction. *But not only is it unreliable, it is false.*" (Emphasis added.)

{¶ 26} Subsequently, the trial judge questioned each juror separately regarding whether they had read and examined State's Exhibit 227B. Each juror indicated that he or she had, in fact, seen and discussed the document with the other jurors. The judge cautioned each juror that during trial no testimony had been offered regarding the exhibit and that the contents of the statement were unreliable. The judge instructed each juror to disregard Rockwell's written statement. For their part, the jurors, in response to questioning from the trial judge, stated that they would be able to disregard the statement and not consider it during their remaining deliberations. When the trial judge initially questioned Juror 3 in regard to his ability to disregard State's Exhibit 227B, the following exchange occurred:

{¶ 27} "The Court: Do you have any problem putting this out of your mind knowing that it's simply not reliable, and it's not worthy of consideration?

{¶ 28} "Juror # 3: *Well, before I couldn't but as you put it in that context, I could now as far as it not being reliable.*

{¶ 29} "The Court: So what you are saying—Correct me if I'm wrong, after you turned this exhibit over to the bailiff and you knew you weren't supposed to see it and you're thinking, well, I already read it so it's still going to kind of affect me.

{¶ 30} "Juror # 3: Well, yeah, until you said it like that, and since she's not under oath it's totally unreliable. She could have been lying or whatever, but I can disregard that.

{¶ 31} "The Court: Since I've given you that instruction it's easier for you to just—

{¶ 32} "Juror # 3: *It just took a load off.*" (Emphasis added.)

{¶ 33} Further, the following instruction was given to Juror 1 by the trial judge:

{¶ 34} "The Court: The court is going to be giving instructions to all of you individually to disregard State's Exhibit 227B. There was no testimony from the person that purportedly handwrote this statement. There was no testimony from that witness. There was no evidence whatsoever.

{¶ 35} "There was no foundation laid for this exhibit. The content of the exhibit—The content of the statement is unreliable. It cannot be considered truthful. If, in fact, it was reliable, it would have been presented to you at trial.

{¶ 36} "So, the court's instruction for you and all the other jurors is to disregard it; to not allow it to influence your verdict one way or the other; to consider that it is unreliable and cannot be trusted and upon that instruction, is that an instruction that you will be able to follow?

{¶ 37} "Juror # 1: I think so, yes.

{¶ 38} "The Court: *You say you think so?*

{¶ 39} "Juror # 1: Yes. *Yes, I can follow that.*

{¶ 40} "The Court: Do you understand that this case as I've explained to you repeatedly throughout the course of this trial that it's critical that you not be exposed to anything that doesn't transpire in the courtroom, and that is a statement that was written purportedly by somebody not in the courtroom, not under oath, where you—The attorneys did not have an opportunity to cross-examine this witness; and you, as jurors, do not have the opportunity to apply the tests of credibility and determine whether or not this person is reliable.

{¶ 41} "And the basic fact that they were not called as a witness, I think, is evidence of their unreliability.

{¶ 42} "Can you accept that?

{¶ 43} "Juror # 1: Yes."  (Emphasis added.)

{¶ 44} The potential impact of this type of colloquy was recognized almost a century ago by Chief Justice Hughes in *Quercia v. United States* (1933), 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321:

{¶ 45} "The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' "

{¶ 46} Juror 1's initial response of "I think so, yes" was seemingly unsatisfactory to the court, and the followup question by the judge apparently nudged the juror to the desired response. Also telltale is Juror 3's statements "Well, before I couldn't" and "It just took a load off."

{¶ 47} Although the court was well intentioned in conducting this voir dire with individual jurors, the emphasis on State's Exhibit 227B may have served only to

highlight its incendiary impact and seared into the minds of the jurors the fact that they should not have received, read, and discussed it.

{¶ 48} After the judge individually questioned each of the jurors, Patterson's counsel renewed his motion for mistrial. The trial judge stated that he would consider the matter overnight and inform the parties of his decision in the morning.

{¶ 49} The next morning, after taking ultimate responsibility for the mistaken inclusion of State's Exhibit 227B in the exhibits that were provided to the jury, the trial judge stated that he believed that the jury could disregard the impact of the document and allowed them to continue deliberations. Specifically, the court stated as follows:

{¶ 50} "The Court: Having said that, I sit here and I recognize that on a daily basis I demand that people take responsibility for their conduct. I do it with defendants. I do it with my kids, and I try to do it with myself.

{¶ 51} "The bottom line here is that the Court admitted it into evidence, albeit inadvertently, an exhibit that should not have been admitted. So I take responsibility.

{¶ 52} "What's important to me as a Judge, is that people and the public have confidence in my integrity and in my character. What's not important to me is that people in the public have some false impression that I'm perfect, and I never make mistakes. So I take responsibility for the Exhibit # 227B going to the jury when it shouldn't have."

{¶ 53} The state offered the following suggestion to the court in regard to additional questioning of the jurors:

{¶ 54} "The State: * * * [I]n reflecting last night and reflecting of the voir dire of the Court of the jurors, and in a very detailed voir dire, all the jurors indicated to the Court and promised the Court that they would completely disregard the items that was [sic] before them; and the record speaks for itself there, but I believe out of an abundance of caution and for the ability of the Court to make specific findings and to insure a fair trial in this matter, I believe that the Court should keep this motion for a mistrial in abeyance, and I believe the jury should be permitted to deliberate; and if,—and that's an if—and when, the jury indicates to the Court that any verdicts have been reached, then I would propose, Your Honor, that the Court before the delivery of any verdicts and without asking the jurors of the contents of those verdicts, bring the jurors in again one by one.

{¶ 55} "Each juror has told the Court that they will follow the Court's instructions to disregard. After they have gone through the deliberation process but before the verdicts are delivered, I believe, the Court should go through the

same process with the jurors and ask them if, in fact, that they did follow the Court's instructions and if, in fact, whether their decision was made without any reference, without any reliance upon the document that the Court has instructed them to disregard. I believe at that point in time that the Court is going to be in the best position to have looked each individual juror in the eye so to speak on two occasions and assess whether or not that, in fact, each and every individual juror has abided by the Court's instructions and followed the Court's instructions so that the Court can be either clear that their deliberations were either free of improper influence or on the other hand, biased by improper influence.

{¶ 56} "But I believe given the sensitive nature of the state of the case, that an additional voir dire after the deliberation so we know prior to the promise that they would and afterwards but before the verdicts were delivered, that a further assurance from the jurors that, in fact, they did—In other words, they promised that they would and afterwards they promised the Court that they did, unless that's not the case."

{¶ 57} Thus, after the jury finished deliberating, but before the verdict was announced, the trial judge interviewed each juror again regarding State's Exhibit 227B. When she was interviewed for second time after deliberations had ceased, Juror 12 stated the following during additional questioning from the trial judge:

{¶ 58} "The Court: Good afternoon, [Juror 12]. Again, I want to thank you for your patience and your service in this case. I don't want you to tell me what your verdict is in this case, but I understand that you and your fellow jurors have reached a verdict; is that correct?

{¶ 59} "Juror # 12: That's correct.

{¶ 60} "The Court: And you and your fellow jurors have not disclosed that verdict to anybody; is that correct?

{¶ 61} "Juror # 12: That's correct.

{¶ 62} "The Court: Well, thank you for that. I brought you and your fellow jurors in individually last night and gave you a very specific instruction about disregarding State's Exhibit # 227B, a one-page document, that in [sic] inadvertently went back to the jury room during your deliberations. I instructed you to disregard it.

{¶ 63} "To not permit it to influence your verdict or your deliberations in any manner. Having reached a verdict in this case, can you assure the Court and the parties in this case that the State's Exhibit 227B and the contents thereof did not influence your deliberations or influence your verdict.

{¶ 64} "Juror # 12: Not at all, no. We went through the law as you gave it to us.

{¶ 65} "The Court: And can you speak for yourself and as far as you know, based on any statements or comments of other jurors, is it your opinion that # 227B was disregarded?

{¶ 66} "Juror # 12: *I believe it was, yes.*

{¶ 67} "The Court: All right. Well, thank you very much." (Emphasis added.)

{¶ 68} Apparently satisfied that the exhibit did not adversely affect the jury's deliberations after questioning each juror a second time, the trial judge overruled defense counsel's motions for mistrial and allowed the jury's verdict to be announced in open court. Patterson was found guilty on all counts and sentenced accordingly.

{¶ 69} Mistrials need to be declared only when the ends of justice so require, and a fair trial is no longer possible. *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623. The decision whether to grant a mistrial lies within the trial court's sound discretion. Id. In order to demonstrate that a trial court has abused its discretion in denying a motion for a mistrial, a criminal appellant must show that the trial court's decision was arbitrary, unreasonable, or unconscionable. *State v. Nichols* (1993), 85 Ohio App.3d 65, 69, 619 N.E.2d 80.

{¶ 70} Normally, in determining whether the trial court properly exercised its discretion, reviewing courts look to whether (1) "there [was] a 'manifest necessity' or a 'high degree' of necessity for ordering a mistrial, or (2) 'the ends of public justice would otherwise be defeated.'" *State v. Widner* (1981), 68 Ohio St.2d 188, 189–190, 22 O.O.3d 430, 429 N.E.2d 1065, quoting *Arizona v. Washington* (1978), 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717. A "manifest necessity" for a mistrial does not mean that a mistrial was absolutely necessary or that there was no other alternative. *Arizona v. Washington,* 434 U.S. at 511, 98 S.Ct. 824, 54 L.Ed.2d 717. In order to exercise "sound discretion" in determining that a mistrial is necessary, the trial judge should allow the defense and prosecution to state their positions on the issue, consider their competing interests, and explore some reasonable alternatives before declaring a mistrial. Id. at 514–516, 98 S.Ct. 824, 54 L.Ed.2d 717.

{¶ 71} In evaluating the prejudice to Patterson that occurred as a result of the mistaken inclusion of State's Exhibit 227B into the evidence reviewed by the jury, we first note the scarcity of pertinent case law in this district and in Ohio, in general. Recently, we held in *State v. Locklin,* Montgomery App. No. 21224, 2006-Ohio-3855, 2006 WL 2105226, that when unadmitted evidence is mistakenly submitted to a jury, the error is harmless if it is repetitive or cumulative of other evidence introduced at trial. Clearly, State's Exhibit 227B was not repetitive or cumulative of evidence introduced during the trial. Thus, it should have been one

of the very first items removed from the box of exhibits prior to the third trial. In fact, the state knew it to be a false statement. In a case in which an unadmitted exhibit is not repetitive, but rather the exhibit is prejudicial to the defendant and the evidence of the defendant's guilt is not otherwise overwhelming, the Fourth District has held that it was reversible error for the trial court to overrule the defendant's motion for mistrial. *State v. Westwood*, Athens App. No. 01CA50, 2002-Ohio-2445, 2002 WL 1183444. In *Westwood*, the court held that the improper submission to the jury of an unadmitted exhibit, a bag of marijuana allegedly purchased from the defendant or someone else at his home, was prejudicial, and curative instructions from the trial judge were insufficient to cure the resulting prejudice. In reaching its decision in *Westwood*, the Fourth District examined numerous federal decisions in the absence of Ohio law on the subject.

{¶ 72} Significantly, we note that federal courts have traditionally upheld the position that verdicts should be set aside when it is shown that the impartiality of jurors may have been affected or when tainted material has come before the jury. *Farese v. United States* (C.A.5, 1970), 428 F.2d 178. The Sixth Amendment to the U.S. Constitution guarantees that "the accused shall enjoy the right to a * * * trial, by an impartial jury * * * [and] to be confronted with the witnesses before him." *Parker v. Gladden* (1966), 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420. "The evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana* (1965), 379 U.S. 466, 472–473, 85 S.Ct. 546, 13 L.Ed.2d 424. "The entire thrust of rules of evidence and the other protections attendant upon the modern trial is to keep extraneous influences out of the courtroom." *Estes v. Texas* (1965), 381 U.S. 532, 592, 85 S.Ct. 1628, 14 L.Ed.2d 543 (Harlan, J., dissenting). Thus, a "jury's exposure during its deliberations to extrinsic information, whatever its source, is an error of constitutional proportions that is grounds for setting aside the verdict, unless the exposure was harmless." *United States v. Santana* (C.A.1, 1999), 175 F.3d 57, 65.

{¶ 73} In the present case, State's Exhibit 227B was never marked and identified during Patterson's third trial, and no one disputes that the document should not have been admitted into evidence. Likewise, its prejudicial effect is clear and compelling. All of the jurors on the panel separately informed the trial judge that they had read and discussed the contents of State's Exhibit 227B with each other. Rockwell's statement was clearly prejudicial and shocking to the senses. The statement tended to support a conclusion that Patterson possessed the mens rea element of recklessness with regard to the infliction of serious physical harm for the charged offenses of aggravated robbery and felony murder.

The disparaging words and joking attributed to Patterson and Manns, if true, would demonstrate a callous disregard for human life. In our view, we cannot say that the state presented overwhelming evidence of the mens rea element of recklessness required for aggravated robbery and murder.

{¶ 74} Significantly, this jury had one question during deliberations:

{¶ 75} "Do we have the complete definition of felony murder? Is there anything else to the law concerning felony murder?"

{¶ 76} Felony murder, of course, requires a showing of recklessness, and the statement attributed to Patterson and Manns by Rockwell ties neatly into the mens rea of the offense.

{¶ 77} We also note that State's Exhibit 227B impeached testimony from Patterson in regard to the identity of the person who had provided her with a return ride to Columbus after abandonment of the rental car in which she was a passenger. Although not necessarily a key point at trial, it certainly undermined Patterson's credibility on that point without the benefit of cross-examination.

{¶ 78} We recognize the trial judge's attempts to cure the prejudicial effect of the inclusion of State's Exhibit 227B by instructing the jury "to disregard [the] exhibit and the contents of [the] statement." During the individual meetings with each juror, the trial judge pointed out that since Rockwell was not called by the state to testify at trial, her statement was "unreliable," and he advised a few, but not all, of the jurors that the statement could not "be considered truthful," as it was not the subject of cross-examination. None of the jurors were told unequivocally that the statement had been determined to be false. We also recognize that each juror individually told the trial judge that he or she would be able to disregard the exhibit during deliberations. Significantly, however, some of the jurors expressed a degree of hesitation by using words such as "I believe" and "I think so."

{¶ 79} A jury will normally be presumed to follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury would be unable to follow the court's instructions and a strong likelihood that the effect would be devastating to the defendant. *Greer v. Miller* (1987), 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618. In the instant case, the jurors read and examined a statement that spoke directly to Patterson's state of mind regarding the death of John Deselem. Any suggestion that Patterson and Manns would laugh about John Deselem's death and disparage him would likely lead a reasonable juror to conclude that Patterson was, at the very least, unrepentant, cruel, and indifferent to human life. Such indifference is a key component of the "perverse disregard" instruction on recklessness.

{¶ 80} Simply put, Rockwell's statement vilified Patterson and was devastating to her defense to aggravated robbery and murder, both of which require proof of recklessness beyond a reasonable doubt. We find that the trial judge's instructions to the jurors were insufficient as a matter of law to cure the prejudicial effect of State's Exhibit 227B. We noted earlier that the repeated references to State's Exhibit 227B, an incendiary statement, may have served only to highlight it further. "We will not blindly assume that a jury is able to follow a * * * court's instruction to ignore the elephant in the deliberation room." *United States v. Morena* (C.A.3, 2008), 547 F.3d 191, 197. The fact that jurors believed that they could disregard State's Exhibit 227B does not convince us that they did so, given its inherent prejudice. When the jurors were given the opportunity to impeach their own verdict before its announcement in open court, it is no surprise that not a single juror did so. The decision on the motion for mistrial should have been made on a wholly objective basis and not on the questioning of individual jurors regarding their deliberative process. We are not willing to conclude that State's Exhibit 227B is something that can simply be erased from a juror's mind. The jurors' good faith in deliberations cannot counter the effect of such an injurious and false hearsay statement. Its inclusion among the exhibits was especially egregious given its known falsity. It violated Patterson's rights under the Sixth Amendment Confrontation Clause. Despite the jurors' efforts to decide this case solely on the facts and the law, State's Exhibit 227B readily arouses passion against Patterson and her accomplices. We are not unmindful of the effect of the decision that we render today. However, the right to a trial by an impartial jury is at the very heart of due process. *Irvin v. Dowd* (1961), 366 U.S. 717, 721–722, 81 S.Ct. 1639, 6 L.Ed.2d 751. This is true, irrespective of the gravity of the crimes charged. The ends of justice and due process require a mistrial. Thus, we hold that the trial court abused its discretion when it overruled Patterson's motion for a mistrial.

{¶ 81} Patterson's first assignment of error is sustained.

### III

{¶ 82} Patterson's second and final assignment of error is as follows:

{¶ 83} "Mahogany Patterson was deprived of her right to the effective assistance of trial counsel. Sixth and Fourteenth Amendments, United States Constitution; Section 10, Article I, Ohio Constitution."

{¶ 84} In light of our disposition regarding Patterson's first assignment, this remaining assignment of error is rendered moot.

### IV

{¶ 85} At least one other issue merits discussion. Although it was not raised by appellate counsel, we cannot ignore the improper voir dire conducted in this case. This court has recognized the wide latitude given the trial court in regulating voir dire. *State v. Nobles* (1995), 106 Ohio App.3d 246, 260, 665 N.E.2d 1137. However, controlling the scope of voir dire is the duty of the trial judge. The purpose of voir dire should be limited to inquiries aimed at determining the prospective jurors' qualifications to serve.

{¶ 86} This record reveals that the state spent significant time in voir dire instructing the jurors on the law, usurping the role of the judge. In fact, the court allowed the defense to do so as well. We caution the trial court that its obligation under Crim.R. 30 is to provide all jury instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as a factfinder. *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640.

### V

{¶ 87} Patterson's first assignment of error having been sustained, her conviction and sentence are reversed, and this matter is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BROGAN and FROELICH, JJ., concur.