[Cite as *State v. Sutherland*, 2022-Ohio-3079.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-16 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-91 |
| | : | |
| JEFFREY SCOTT SUTHERLAND | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of September, 2022.

. . . . . . . . . . .

DEBORAH S. QUIGLEY, Atty. Reg. No.0055455, Assistant Prosecuting Attorney, Darke County Prosecutor's Office, 504 South Broadway Street, Greenville, Ohio 45331
        Attorney for Plaintiff-Appellee

MEGAN M. PATITUCE, Atty. Reg. No. 0081064 & JOSEPH C. PATITUCE, Atty. Reg. No. 0081384, 16855 Foltz Industrial Parkway, Strongsville, Ohio 44149
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Jeffrey Scott Sutherland appeals from his conviction after he was found guilty by a jury of two counts of rape (child under 10) and sentenced to 25 years to life in prison. For the reasons that follow, the judgment of the trial court will be affirmed in part, vacated in part, and remanded.

## I.      Facts and Procedural History

{¶ 2} In early 2020, E.S. lived with her mother, Amariah, three siblings, and Sutherland, who was engaged to be married to Amariah and was the father of two of E.S.'s siblings. They resided first in a house in Greenville ("old house") and then in one in Arcanum ("new house").

{¶ 3} On the morning of April 20, 2020, Amariah took her four children to her sister's house (Aunt) while she was at work. The plan was for Aunt to watch the children in the morning, and then their grandmother (Grandmother) was to pick them up for the afternoon. At some point that morning, the children began to play a game called "I have a secret." When it was E.S.'s turn, she revealed that "Scotty's [Sutherland] bad." Overhearing the revelation, Aunt pulled E.S. aside to inquire further, and once in the other room, she told Aunt that "Scotty touched me in my private. * * * Where I go to the bathroom." Trial Tr. at 214-215.

{¶ 4} When Grandmother arrived, Aunt informed her of E.S.'s disclosure, and after getting the children back to her house, Grandmother spoke to E.S. in the garage, where she confirmed that "Scotty touched me in a bad spot." Trial Tr. at 216. Amariah was called, and when she arrived, Grandmother was in the garage crying. She then found E.S., who

confirmed the story.

{¶ 5} After learning of the accusations, Amariah's first call was to the pediatrician who suggested going to Dayton Children's Hospital for examination and sexual assault kit administration. Amariah took E.S. to the hospital, where she was examined, and from there they went to the Darke County Sheriff's Office, where they met with Detective Rachael Prickett.

{¶ 6} Detective Prickett testified that she met with E.S., Amariah, and Aunt, and then called Sutherland to notify him of the allegations against him. She did not, however, go into any details. Amariah also contacted Sutherland around 10:30 p.m. that evening, but like Detective Prickett, did not offer anything specific. Detective Prickett obtained a search warrant for Sutherland's phone, which was seized the following day, April 21, 2020. The phone was analyzed by deputies and the Ohio Bureau of Criminal Investigations (BCI), and it was determined that the phone had been used to make a number of incriminating Google searches, including: "Detecting the presence of male DNA in cases of sexual assault without ejaculation"; "Detecting seminal fluid and saliva in sexual assault kits"; "Detecting saliva inside a vagina"; "Digital vaginal DNA life"; "How long does skin DNA last in a woman's body"; "How long does skin DNA last"; and "How long can DNA last in a vagina?"

{¶ 7} On June 26, 2020, Sutherland was indicted on three counts of rape (child under 10) in violation of R.C. 2907.02(A)(1)(b). The case proceeded to an initial trial date in March 2021, but in a pretrial hearing, the court decided to prohibit the State from introducing the Google searches as evidence. The State appealed, and this Court

affirmed in part and reversed in part, finding that seven of the nine proffered Google searches were relevant and admissible. *State v. Sutherland,* 2021-Ohio-2433, 173 N.E.3d 942 (2d Dist.). After remand, the case proceeded to trial on December 6, 2021.

**{¶ 8}** The jury first heard testimony from E.S., who detailed three instances of inappropriate behavior by Sutherland. The first incident happened at the "old house" in Greenville. E.S. recounted that while she and her siblings were playing outside, Sutherland called her upstairs to the room he shared with Amariah. Once she arrived, Sutherland closed and locked the door and then summoned E.S. to get in bed with him. Once there, Sutherland pulled down E.S.'s pants and underwear, and using a purple sex toy (E.S. described it as "the purple thing"), he touched her vagina. E.S. described it as "feeling weird" and testified that she told Sutherland to stop, but he continued to touch her until the other kids started knocking on the door.

**{¶ 9}** The next incident E.S. described happened in the "new house" in Arcanum. E.S. stated that she had spent the previous night at her grandfather's house, so after he dropped her off, she was tired and decided to rest on the couch. Next thing she knew, Sutherland sat down by her head, licked his finger, and put it in her anus. While the first incident was described as "feeling weird," E.S. asserted that this time it "hurt bad." According to E.S., she told Sutherland to stop, but he continued until she said she needed to go to the bathroom.

**{¶ 10}** The third incident also happened at the "new house." This time, E.S. testified that one morning while she was upstairs asleep in her bedroom, Sutherland took her downstairs to his bed and laid her next to her sleeping little sister. Sutherland then

pulled down her pants, licked his finger, and touched her vagina. E.S. told the jury that this incident "hurt" and that she again told him to stop. Sutherland did not comply until the dog started barking.

{¶ 11} At the close of the State's case-in-chief, Sutherland moved for a Crim.R. 29 judgment of acquittal on all counts, arguing that the State failed to prove the necessary elements of rape. The trial court granted the motion as to Count 3, concluding that there was no evidence submitted that there was sexual conduct, a requisite element in rape, but denied the motion for Counts 1 and 2. Lesser included offenses of gross sexual imposition (GSI) were also given to the jury to consider. Sutherland did not present any witnesses on his behalf but did submit several exhibits for the jury to consider.

{¶ 12} After deliberating for several hours and submitting a question to the court (which will be discussed in detail in assignments of error one and two), the jury found Sutherland guilty of rape in both counts. The trial court sentenced Sutherland to a prison term of 25 years to life on each count, to run concurrently, and he was classified as a Tier 3 sex offender.

{¶ 13} Sutherland has appealed and raises four assignments of errors.

**II.    Mistrial Motion**

{¶ 14} In his first assignment of error, Sutherland argues that the trial court erred when it denied his motion for a mistrial after it was discovered that the jury had received an exhibit that was not admitted during trial.

{¶ 15} At the close of its case-in-chief, the State moved to admit 19 exhibits; chief among them were 5A, 5B, 5C, 5D, 5E, 5F, and 5G – the admissible but incriminating

Google searches listed above -- and part of a larger BCI report generally labeled as State's Exhibit 5. The issue, however, was that instead of sending the jury only exhibits 5A, 5B, 5C, 5D, 5E, 5F, and 5G, the entire BCI report was inadvertently sent to the jury room (which included internet searches for "father-step daughter" pornography that the State did not bring up during testimony or attempt to admit).

{¶ 16} After an unknown amount of deliberation with the entire Exhibit 5 in its possession, the jury sent a note to the court (which is not a part of our record) asking whether it could consider the entire exhibit since it was not discussed during trial. After conferring with counsel, the court sent back an answer which, according to the briefs and transcript, included a curative instruction. The instruction was deemed satisfactory by both parties, Trial Tr. at 508, and the exhibit was removed from the jury's possession. Nevertheless, Sutherland moved for a mistrial, stating, "After realizing the impact that Exhibit Number 5 could potentially have on the jury, we feel as though the jury is tainted. They are now privy to information that could infer guilt just by the nature of the exhibit itself." Trial Tr. at 509. The trial court denied the motion.

{¶ 17} The gravamen of Sutherland's argument on appeal is that, even with the court's curative instruction, the material the jurors saw was so prejudicial that he could not have received a fair trial. The State, on the other hand, contends that while the admission of the exhibit was an error, it did not change the outcome for Sutherland.

{¶ 18} "Mistrials need to be declared only when the ends of justice so require, and a fair trial is no longer possible." *State v. Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439, ¶ 69 (2d Dist.). The decision lies within the sound discretion of the

court, so to demonstrate that it abused its discretion, an appellant must demonstrate the decision was arbitrary, unconscionable, or unreasonable. *Id.*

{¶ 19} Our analysis for this assignment of error is multifaceted. The first issue we must consider is if the court erred when it sent the entire Exhibit 5 to the jury. The answer to this first question is unquestionably *yes* – both parties agree. The next step in the analysis, then, is to determine how impactful the error was.

{¶ 20} Evid.R. 103(A) states that a case will not be reversed because of an erroneous evidentiary ruling unless it involves a "substantial right." The term "substantial right" is not defined in the rule but is usually interpreted to invoke the harmless error doctrine. Crim.R. 52(A), which defines harmless error, states: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." The Ohio Supreme Court has stated whether a defendant's substantial rights have been abridged depends on (1) whether the alleged error prejudiced the defendant (i.e., whether it had an impact on the trial); (2) whether, after the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt; and (3) whether the error was harmless beyond a reasonable doubt. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37. *See also State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7; *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 18.

{¶ 21} As to the first element, Sutherland reasons that the information the jury saw in Exhibit 5 was so prejudicial that it necessarily affected the verdict. The State, on the other hand, points out that the trial court gave a curative instruction which advised the

jurors that they were not to consider the unadmitted portions of the exhibit. While Sutherland is correct that there were portions of Exhibit 5 that painted him in an extremely unfavorable light, we conclude that it did not impact the trial.

{¶ 22} First, both parties agree that the court sent an instruction to the jurors telling them that they were to only consider the admitted portions of Exhibit 5 (5A, 5B, 5C, 5D, 5E, 5F, and 5G), and while we do not have a record of what the response actually said, the transcript is clear that both parties assented to its content. Next, Ohio courts have consistently held that juries are presumed to follow the instructions, including curative instructions given by a trial court. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995); *State v. Wood*, 2d Dist. Clark No. 2016-CA-69, 2018-Ohio-875, ¶ 67. In this case, however, it is more than a presumption, as the trial court asked each juror on the record if there was "any reference or use of Exhibit 5, the BCI report?" Each one explicitly denied using or considering the unadmitted materials to reach the verdict. Trial Tr. at 511-513. The trial court was able to assess the jurors' credibility and we must defer to its judgment in that regard. *State v. Phillips*, 6th Dist. Lucas No. L-06-1135, 2007-Ohio-2150, ¶ 18 (the trial court is in the best position to assess juror credibility*); State v. Melanson*, 804 A.2d 394, 398 (Me. 2002) ("The court's determination of whether a juror can remain impartial is entitled to substantial deference because of the trial court's ability to observe and assess the juror's credibility.").

{¶ 23} We recognize that this Court has, on one occasion, come down the other way on this issue. In *State v. Patterson*, 2010-Ohio-2012, 935 N.E.2d 439 (2d Dist.), the jury inadvertently received prejudicial material to consider during deliberations. We held

that despite a curative instruction given by the court, the danger of prejudice was too great, and the court abused its discretion when it denied the defendant's motion for a mistrial. Sutherland's case is distinguishable. For instance, in *Patterson*, when asked by the trial court if they could disregard the inadmissible evidence during deliberations, some of the jurors were hesitant, using words like "I think so," and "I believe." Here, each juror unequivocally confirmed that there was no reference or use of Exhibit 5 in reaching the verdict. Additionally, the prohibited evidence in *Patterson* went directly to the mens rea of the crime, whereas in Sutherland's case, the evidence did not prove an element of the crime, it simply portrayed him in an unfavorable light.

{¶ 24} Even if Sutherland could establish the first element, his argument would fail on the second, because the remaining evidence established his guilt beyond a reasonable doubt.

{¶ 25} The jury heard very specific testimony from E.S. that on multiple occasions, Sutherland touched her inappropriately on both her vagina and anus. She told the jury that each time he licked his finger and then inserted it. This testimony aligned with the Google searches found on Sutherland's phone ("Detecting the presence of male DNA in cases of sexual assault without ejaculation"; "Detecting seminal fluid and saliva in sexual assault kits"; "Detecting saliva inside a vagina"; "Digital vaginal DNA life"; "How long does skin DNA last in a woman's body"; "How long does skin DNA last"; and "How long can DNA last in a vagina?"). There was sufficient evidence presented to the jury to establish guilt beyond a reasonable doubt. It was an error for the jury to see the entirety of Exhibit 5, but it was harmless error as Sutherland's substantial rights were not abrogated.

{¶ 26} Having found that the introduction of Exhibit 5 to the jury was harmless error, we must decide if it was error for the trial court to deny Sutherland's mistrial motion. In this case, it cannot be said that a fair trial was impossible after the jury saw the unadmitted portions of Exhibit 5. We previously concluded because Sutherland was not prejudiced to the point that it had an impact on the trial, and because there was sufficient evidence to convict (even without the exhibit), the error was harmless. Thus, the trial court did not abuse its discretion when it denied the mistrial motion. Sutherland's first assignment of error is overruled.

### III. Record of Jury Question and Response

{¶ 27} The trial court mistakenly sent the entirety of State's Exhibit 5 into the jury room after the close of testimony. Approximately three hours into deliberations, the jury sent a question (the trial transcript refers to the question as Court Exhibit 2) to the court regarding consideration of the whole exhibit, which included both admitted evidence (State's Exhibits 5A, 5B, 5C, 5D, 5E, 5F, and 5G) and evidence that had not been discussed during trial. After off-the-record discussions, the court, along with both parties, agreed to a response and curative instruction. In the time between trial and our consideration of this case, however, the question from the jury and the response from the court have been lost or destroyed. In his second assignment of error, Sutherland argues that the trial court committed reversable error when it failed to make a record of the jury question and the court's response to it.

{¶ 28} Sutherland's legal argument is based on R.C. 2315.01(A)(7) and R.C. 2945.10(G) which, generally, require a trial court to reduce a jury instruction or charge to

writing if requested by a party, and then to retain the papers with the case file. While the record does not contain the original jury question or curative instruction, the trial court sought to remedy the issue by supplementing the record. In April 2022, pursuant to App.R. 9(E), the trial court ordered the parties to file their recollections of the jury question and the court's response. The parties complied, gave their accounts, and then the court did likewise. The court's and the parties' recollections basically match up with what is found in the transcript: the jurors asked if they could consider the entirety of State's Exhibit 5, the parties and the court conferred and agreed that the jury was not to consider the exhibit, and then Exhibit 5 was removed from the jury room. Even without the actual question and answer, we have a clear picture of what happened. Sutherland has not been prejudiced by the lack of the originals.

{¶ 29} Further, Sutherland did not object to the curative instruction given at trial, and indeed, agreed to it, making this case akin to *State v. Cottrell*, 8th Dist. Cuyahoga No. 81356, 2003-Ohio-5806. In *Cottrell*, the defendant argued that the court had failed to clearly advise the jury regarding a gang specification because it failed to define the offenses under R.C. 2923.41(B)(1)(c). The trial court attempted to clarify its instruction by attaching Section C from R.C. 2923.41 that it read to the jury to the written instructions it had submitted. Cottrell argued that because the trial court did not preserve the written instructions for the record, there was no way to tell what instructions the jury had before it regarding the gang specification.

{¶ 30} The Eighth District noted that while written jury instructions should be preserved as part of the record, a failure to do so is not necessarily reversible error,

especially when the parties had the opportunity to review the proposed instructions, and there were no objections. *Id.* at ¶ 51. Because there were no objections, the *Cottrell* court reviewed the assignment of error under the plain error standard. The same framework applies here. Because Sutherland did not object to the curative instruction, he bears the burden of demonstrating that any error in failing to preserve the written instruction resulted in prejudice to him. *Id.* at ¶ 52. He cannot do so, and as a result, the second assignment of error is overruled.

## IV. Sufficiency of the Evidence

{¶ 31} Sutherland's third assignment of error raises the claim that his convictions on Counts 1 and 2 were not supported by sufficient evidence.

{¶ 32} "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 33} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 34} To sustain a conviction for rape, in violation of R.C. 2907.02(A)(1)(b), the State must prove that a defendant engaged in sexual conduct with a person who is less than 13 years of age. R.C. 2907.01(A) defines "sexual conduct" as the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another.

{¶ 35} E.S. testified the first incident happened at the "old house" in Greenville. While the other children were outside playing, Sutherland called E.S. up to his bedroom and then locked the door once she was inside. Sutherland told E.S. to get into bed, and when she did, he pulled down her pants and underwear and put a purple dildo "where I [E.S.] go to the bathroom * * * [to] pee." Trial Tr. at 225-226. E.S. described the Sutherland's actions as feeling "weird" and said it "hurt." Trial Tr. at 227.

{¶ 36} According to E.S.'s testimony, the second incident occurred at the "new house" in Arcanum. E.S. told the jury that while she was lying down, resting on the couch, Sutherland sat down beside her and began showing her something on his phone. He then licked his finger and put it in her anus. E.S. testified that this incident "hurted [sic] bad." Trial Tr. at 232.

{¶ 37} In addition to the first-hand account provided by E.S., the jury saw exhibits (5A through 5G) showing Google search results from Sutherland's phone which were made after he was informed by Detective Prickett that he was being investigated for abusing E.S. The searches included the following terms: "Detecting the presence of male DNA in cases of sexual assault without ejaculation (5A)"; "Detecting seminal fluid and saliva in sexual assault kits (5B)"; "How long does skin DNA last (5C)"; "How long does

skin DNA last in a woman's body (5D)"; "How long can DNA last in a vagina (5E)"; "Detecting saliva inside a vagina (5F)"; "Digital vaginal DNA life (5G)."

**{¶ 38}** We will begin with Count 2 (the "new house" incident) because the analysis is straightforward. During her testimony E.S. definitively stated that Sutherland licked his finger and put it in her anus. This is demonstrated in two exchanges – one with defense counsel on cross examination and one on redirect with the State.

Defense Counsel: So, he never put his fingerprint up the hole, just on the outside?

E.S.: Like – yeah, he, like, put, like, inside.

Defense Counsel: He put it on the inside.

E.S.: Yeah.

Trial Tr. at 246. This point was reiterated during the State's redirect.

Prosecutor: You told me about when he touched – he licked his finger and touched where you went poop. You told me he licked his finger and touched you where you went pee. Which of them went inside you?

E.S.: Like the poop one.

Prosecutor: The poop one?

E.S.: Yeah.

Prosecutor: Okay. And that was the one where you're on the couch.

E.S.: Yeah.

Trial Tr. at 251. Based on this testimony alone, there is no question that the State met the elements of rape as to Count 2. E.S. clearly described sexual conduct. The establishment of this element for Count 1 (the "old house" incident), however, is much less apparent. In

Count 1, Sutherland is accused of using a purple sex toy to abuse E.S. During direct examination, E.S. described being summoned up to the bedroom that Sutherland shared with her mother, Sutherland's taking off her pants, producing a "purple thing," and then using it to "put it where I go to the bathroom." Trial Tr. at 225. E.S. described the sensation as "it doesn't like feel good. It just * * * like it's weird." Trial Tr. at 226. She later admitted that "it hurt a little bit." Trial Tr. at 227. The testimony during direct examination does not obviously describe penetration of any type.

{¶ 39} During cross-examination, E.S. appeared to outright deny that there was penetration during the "old house" incident.

Defense Counsel: That purple thing was just on the outside of you, correct? It never went inside you, correct?

E.S.: No. Yeah.

Defense Counsel: So, it was just on the outside.

E.S.: Yeah.

* * *

Defense Counsel: And the purple thing didn't go inside you, correct.

E.S.: No.

Trial Tr. at 245-247. During redirect, the closest E.S. came to describing penetration was saying that Sutherland put the "purple thing" between her legs while her legs were closed. Trial Tr. at 249. She is clearly describing sexual *contact* (*see* R.C. 2907.01(B), describing sexual contact as "any touching of an erogenous zone of another"), but not sexual *conduct*.

{¶ 40} As to Count 1, even taken in the light most favorable to the State, we cannot conclude that the essential elements of rape were proven beyond a reasonable doubt; E.S. never described sexual conduct, and in fact specifically stated that there was no penetration.

{¶ 41} We conclude that the State failed to present sufficient evidence to sustain a conviction of rape in Count 1, the "old house" incident, as E.S. described sexual contact, not conduct. The State's evidence, however, was sufficient to convict Sutherland of GSI, in violation of R.C. 2907.05, a felony of the third degree and lesser-included offense of rape. "When a verdict is not sustained by sufficient evidence or is contrary to law; but if the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial." *State v. Hudson*, 2018-Ohio-423, 106 N.E.3d 205, ¶ 35 (2d Dist.), quoting R.C. 2945.79(D); *State v. Patton*, 2d Dist. Clark No. 2011-CA-94, 2013-Ohio-961, ¶ 18.

{¶ 42} Conversely, as to Count 2, the first "new house" incident, it is clear that the State did provide evidence of penetration and therefore sufficient evidence to sustain a rape conviction.

{¶ 43} Sutherland's assignment of error is overruled in part and sustained in part.

## V.     Manifest Weight of the Evidence

{¶ 44} In his fourth assignment of error, Sutherland asserts that his convictions were against the manifest weight of the evidence. Because we already determined that the evidence was insufficient to sustain a conviction on Count 1, in this section we will

only consider Count 2.

{¶ 45} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except "'in the exceptional case in which the evidence weighs *heavily* against the conviction.'" (Emphasis added.) *Id.*

{¶ 46} Sutherland raises several arguments to support his manifest weight claim. The first takes aim at the credibility and believability of E.S. and her mother, Amariah. He points out that Amariah testified that she did not suspect Sutherland could do such a thing and that when Amariah first met with Detective Prickett, she told her that she "didn't feel it in [her] heart that [Sutherland] would do something wrong." Trial Tr. at 303. Sutherland even points out that throughout the pendency of the case, Amariah not only continued to talk with him, but the two maintained a sexual relationship. She also testified that E.S. had not been consistent as to who abused her, at one point telling Amariah that her older brother did it. According to Amariah, E.S. once claimed the whole thing could have been a dream.

{¶ 47} Despite the alleged contradictions, "[i]t is well-established that when

conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35. This Court has said that it "will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013-Ohio-5345, ¶ 16. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24. The jury in this case believed E.S.'s testimony that Sutherland raped her.

**{¶ 48}** Finally, Sutherland contends that the Google searches found on his phone should not have been given persuasive weight because his phone "did not have a lock on it and there was no evidence as to who conducted the searches." Appellant's Brief at 13. The jury clearly did not believe that someone else took Sutherland's phone and searched for incriminating information on Google. The jury also did not believe, as Sutherland posits, that the searches were innocuous – merely someone trying to find out more information about crimes of which he was accused. The searches were very specific, searched for before being told by law enforcement or Amariah of the specific allegations, and matched up with the acts E.S. accused Sutherland of committing.

**{¶ 49}** We cannot conclude that this is an exceptional case in which the evidence weighed heavily against the conviction. Accordingly, we find that Sutherland's conviction was not against the manifest weight of the evidence and his fourth assignment of error is

overruled.

### VI. Conclusion

**{¶ 50}** Having found that Sutherland's conviction for rape in Count 1 was not supported by sufficient evidence, the trial court's judgment of conviction will be vacated as to that Count only; the matter will be remanded for the trial court to modify its judgment to indicate that Sutherland was convicted of GSI and for sentencing on that offense. The trial court's judgment of conviction for rape as to Count 2 will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

Deborah S. Quigley
Megan M. Patituce
Joseph C. Patituce
Hon. Jonathan P. Hein