[Cite as *State v. Smith*, 2023-Ohio-4565.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29597 |
| | : | |
| v. | : | Trial Court Case No. 2019 CR 04182 |
| | : | |
| CHRISTOPHER L. SMITH | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 15, 2023

. . . . . . . . . . .

LUCAS W. WILDER, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Christopher L. Smith was convicted after a jury trial in the Montgomery County Court of Common Pleas of two counts of murder with accompanying firearm specifications, one count of felonious assault (serious physical harm), and two counts of

having weapons while under disability.   He appeals from his convictions, challenging the trial court's denial of several pretrial motions, its denial of his post-trial motion for a mistrial or a new trial, certain conduct by the court and the prosecutor during the trial, and the sufficiency and manifest weight of the evidence.   For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} In January 2020, Smith was charged in a 14-count indictment with four counts of murder, three counts of felonious assault (serious physical harm), three counts of felonious assault (deadly weapon), two counts of having weapons while under disability (prior offense of violence), and two counts of having weapons while under disability (prior drug conviction).   The murder and felonious assault counts contained three-year firearm specifications.

{¶ 3} The charges stemmed from two shootings that occurred near each other but several hours apart on December 5, 2019.   Counts One through Eight related to the shooting death of Brandon Harris and the non-fatal shooting of William Earnest at approximately 3:00 a.m.at Rick's Jazz Club, located at 1832 Lakeview Avenue in Dayton. Counts Nine through Fourteen arose out of the shooting death of Clarence Brown at approximately 10:10 a.m. the same day in the front of the Save Food Super Market, located behind the jazz club at 1829 Germantown Street.

{¶ 4} Smith filed numerous motions during the pendency of his case.   Of relevance to this appeal, he first moved to suppress all eyewitness identifications and any evidence seized from his residence.   He argued that the photo identification technique

used by law enforcement officers was inherently suggestive and that there was a substantial risk of irreparable mistaken identification. Smith further asserted that the officers searched his residence without a valid search warrant or his consent and that no exigent circumstances existed. He claimed that the search warrant had been issued without probable cause and that the items recovered were beyond the scope of the warrant. Smith later amended his motion to further claim that items were unlawfully seized from his residence in Stockbridge, Georgia, where he was ultimately arrested. After hearings on two separate dates and post-hearing briefing, the trial court overruled Smith's original motion. With the agreement of counsel, it deferred a hearing on the issue raised in the amended motion.

{¶ 5} Smith also asked the court for "relief from prejudicial joinder of counts in the indictment." He argued that the two sets of offenses were completely unrelated and were alleged to have occurred at different times and at different locations and to have involved different witnesses. Smith argued that his right to a fair trial would be prejudiced by conducting a trial of both incidents together. The trial court orally overruled the motion at the hearing on Smith's motion to suppress on August 5, 2020. A written entry denying the motion was filed in February 2022.

{¶ 6} Smith filed several motions on February 14, 2022. First, he sought reconsideration of the trial court's ruling on Branch II of the motion to suppress (addressing the search of Smith's Ohio residence) and asked for a ruling on Branch III (the search of Smith's Georgia residence). The State responded that the issues raised regarding the Georgia residence were moot because no items of evidentiary value were

located there.   On June 30, 2022, the trial court denied the motion for reconsideration of Branch II and declared Branch III moot.

{¶ 7} Second, Smith asked the trial court to order the State to disclose all confidential informants referred to in the search warrant for his Ohio residence.   He asserted that he would be "highly prejudiced without the disclosure of the informant," because the informant was the "main person who accused Mr. Smith of the shootings." He argued: "The identity of the informant is beneficial to the defendant because the when, where, how, and why, the informant allegedly obtained his alleged information can show that the informant or someone close to the informant may be the actual shooter.   It is no way that such an informant could have possessed such information when Mr. Smith himself did not."   With the agreement of the parties, no hearing on the motion was held. The trial court denied this motion on May 23, 2022.

{¶ 8} Third, Smith moved to suppress all evidence obtained from his cell phone without a warrant.   He argued that his constitutional rights were violated when the police "pinged" his phone to find its location without a search warrant and when no exigent circumstances existed.   After a hearing on June 2, 2022, the trial court overruled the motion.

{¶ 9} Finally, Smith asked the court to reconsider its denial of his motion for relief from prejudicial joinder.   This motion was denied on May 23, 2022.

{¶ 10} A jury trial commenced on July 25, 2022.   The State presented the testimony of witnesses from both shooting scenes, Earnest, several of the responding patrol officers and investigating homicide detectives, the evidence technician, the deputy

coroner who conducted or supervised the autopsies, and a firearm examiner from the crime lab. The State also offered numerous exhibits, including photographs, surveillance videos, spent bullets and bullet cartridges, photo spreads, bullets found in Smith's apartment, and other items. Smith offered four witnesses in his defense: the bartender at the jazz club, a witness for the food market shooting, Detective Williams (who had previously testified as a State's witness), and Dr. Melissa Berry, a memory and eyewitness identification expert.

{¶ 11} On August 5, 2022, after deliberations, the jury found Smith guilty of all offenses and specifications. Five days later, Smith moved for a mistrial or, in the alternative, a new trial under Crim.R. 33. Smith explained that the court, prosecutor, the State's representative, and defense counsel went into the jury room and spoke with jurors after the verdict was announced and the jury released. He argued that, based on a comment by a juror about what evidence he found meaningful, the jury apparently viewed a video that had not been properly admitted. The trial court denied the motion without a hearing.

{¶ 12} After a presentence investigation, the trial court proceeded with sentencing. After merging several counts and specifications, the trial court sentenced Smith to 15 years to life in prison for Harris's murder, plus three years for the firearm specification (Count 3), a minimum of two years and a maximum of three years for the felonious assault of Earnest (Count 5), 18 months for each count of having weapons while under disability (Counts 7 and 10), and 15 years to life for Brown's murder, plus three years for the firearm specification (Count 13). Counts 3, 5, and 13 were to be served consecutively. The

trial court described the aggregate sentence as 38 years to life in prison. (The aggregate sentence more accurately should be a minimum of 38 years to life in prison to a maximum of 39 years to life in prison.) Smith was also ordered to pay restitution of $3,866 and $367.50 for the costs of extradition.

{¶ 13} Smith appeals from his conviction, raising seven assignments of error.

## II. Prejudicial Joinder of Offenses

{¶ 14} In his first assignment of error, Smith claims that the trial court erred in failing to sever the trials of the jazz club offenses and the food market offenses. He argues that the improper joinder caused an unfavorable impression in the minds of the jury and that the jury likely was confused and used one incident as corroborative of the other. Smith further emphasizes that evidence regarding the unrelated incidents would not have been admissible under Evid.R. 404(B) had the charges been tried separately.

{¶ 15} Multiple offenses may be charged in the same indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). Joinder of such charges is favored as it conserves judicial resources, minimizes the possibility of incongruous results that can occur in successive trials before different juries, and diminishes the inconvenience to witnesses. *State v. Broadnax*, 2d Dist. Montgomery No. 21844, 2007-Ohio-6584, ¶ 33; *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 16} Nevertheless, a defendant may request separate trials on the ground that he or she is prejudiced by the joinder of offenses. Crim.R. 14. The defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 104, quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

{¶ 17} Even if the equities support severing the charges, the State can overcome the defendant's claim of prejudicial joinder in two ways. First, the State can show that it could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B). *Ford* at ¶ 104. Alternatively, the State can show that the evidence of each crime joined at trial is "simple and direct." *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *Broadnax* at ¶ 38. The "simple and direct" test is satisfied if the trier of fact would not confuse the offenses or improperly cumulate the evidence of the various crimes. *Lott* at 164; *Broadnax* at ¶ 38. "[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of whether the evidence is admissible as other-acts evidence." (Citations omitted.) *State v. Coley*, 93 Ohio St.3d 253, 260, 754 N.E.2d 1129 (2001), citing *Lott* at 163.

{¶ 18} We generally review a trial court's denial of a Crim.R. 14 motion for an abuse of discretion. *State v. Pate*, 2021-Ohio-1838, 173 N.E.3d 567, ¶ 36 (2d Dist.); *Ford* at ¶ 106. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. In order to meet this standard, a

defendant must "affirmatively demonstrate (1) that his [or her] rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *Ford* at ¶ 106, quoting *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992).

{¶ 19} However, if a motion for prejudicial misjoinder is not renewed at the close of the State's case or at the conclusion of the evidence, a defendant forfeits his or her ability to raise the issue on appeal, and we review the matter only for plain error. *State v. Kocevar*, 2023-Ohio-1513, 213 N.E.3d 1240, ¶ 15 (2d Dist.); *State v. McComb*, 2017-Ohio-4010, 91 N.E.3d 255, ¶ 51 (2d Dist.), citing *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 12 (2d Dist.). In this case, Smith did not expressly renew his objection to joinder at the conclusion of the evidence, although he had indicated prior to voir dire that he had a continuing objection for his pretrial motions, including his motion for severance.

{¶ 20} In overruling Smith's supplemental motion for relief from prejudicial joinder, the trial court determined that both the "other acts" and "simple and direct" tests were satisfied. As to other acts, the trial court noted that the two murders occurred only seven hours apart and directly next door to each other, that both offenses were committed with the same type of gun, and that video evidence purportedly showed the same clothing worn by the perpetrator in each offense. The court found that there was "no question that evidence from each offense would be admissible in the other trial as proper other

acts evidence to establish identity (at a minimum)."

{¶ 21} With respect to the "simple and direct" test, the court also found that Smith would not be prejudiced by trial of the two incidents together. It reasoned: "Even though these incidents occurred only seven hours and right next door, there are separate witnesses for each incident and there is expectation of very little cross-over in witnesses outside of law enforcement. This is not a complex case where the jury will be confused by hearing evidence of the two separate incidents; they should have no difficulty segregating the charges in each count." Joinder Dec. (May 23, 2022).

{¶ 22} We find no error, plain or otherwise, in the trial court's decision. Although the two events occurred near to and within hours of each other, the incidents themselves were easily differentiated and uncomplicated. The jury was capable of discerning the evidence relevant to each charge, and there was little possibility that the jury would confuse the various incidents to Smith's prejudice. Accordingly, the trial court did not abuse its discretion in denying Smith's motion for relief from prejudicial joinder.

{¶ 23} Emphasizing similarities in the evidence collected from both crime scenes, the State further asserts that the evidence regarding the two shootings would have been admissible at the separate trials under Evid.R. 404(B) if the offenses had been severed. Evid.R. 404(B)(1) states: "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." In other words, it does not necessarily follow that because a person performed a particular act, he or she committed the act at issue. Evid.R. 404(B)(2) recognizes that other-act evidence may properly be used for other

purposes, such as to establish the identity of the perpetrator. *See State v. Leigh*, 2023-Ohio-91, 206 N.E.3d 37, ¶ 52-53 (2d Dist.).

**{¶ 24}** The identity of the shooters was the main issue at trial. Both incidents occurred close together (both physically and temporally), involved the same weapon and similar ammunition, and videos related to the different shootings appeared to show that the perpetrator for each shooting was wearing the same clothing. Witness testimony identifying Smith in each case was relevant to establishing the shooter's identity for each offense. With these circumstances, the trial court reasonably concluded that evidence from each offense would be admissible in the other trial as proper other-acts evidence to establish identity.

**{¶ 25}** Smith's first assignment of error is overruled.

### III. Motion to Suppress

**{¶ 26}** In his second assignment of error, Smith claims that the trial court erred in failing to grant his motions to suppress eyewitness identifications, evidence seized from his residence in Trotwood, Ohio, and evidence from his cell phone.

**{¶ 27}** An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.* "Accepting these facts as true, the appellate court must then

independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, quoting *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13. The trial court's application of law to the findings of fact is subject to a de novo standard of review. *State v. Shepherd*, 2d Dist. Montgomery No. 29123, 2021-Ohio-4230, ¶ 10.

### A. Photo Array Identification

{¶ 28} During the police investigations of both shootings, various detectives presented photo spreads to multiple witnesses. On appeal, Smith challenges the admissibility of three pretrial identifications on the ground that Detective Zachary Williams, the detective who administered those photo spreads, was not a "blind administrator."

{¶ 29} Due process may require the suppression of eyewitness pretrial identification when the basis of the identification creates a substantial likelihood that the witness is mistaken. *State v. Shepherd*, 2d Dist. Montgomery No. 29123, 2021-Ohio-4230, ¶ 11; *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Courts employ a two-step process to determine the admissibility of a challenged identification: (1) the defendant must demonstrate that the identification procedure was unduly suggestive; and (2) if the defendant meets this burden, the court must consider whether the identification, under the totality of the circumstances, was reliable despite the suggestive procedure. *State v. Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 72-73.

{¶ 30} Reliability is the "linchpin" in determining the admissibility of pretrial identifications. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140

(1977). "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

**{¶ 31}** R.C. 2933.83 sets out the standards for lineup and photo identification in the criminal context. As applicable to this case, the statute requires that the lineup be conducted by a "blind administrator," meaning the person conducting the lineup does not know the identity of the suspect. R.C. 2933.83(A)(2). However, the failure to strictly comply with the statutory requirements is not, by itself, sufficient to suppress the identification. *Shepherd* at ¶ 14; *State v. Green*, 2d Dist. Montgomery No. 28614, 2020-Ohio-5206, ¶ 24. Rather, we focus on whether "the procedure used in administering the photospread in this case, while not in compliance with R.C. 2933.83, was 'not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' " *State v. Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 311 (2d Dist.), quoting *State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395, ¶ 35.

**{¶ 32}** We review a trial court's denial of a motion to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

**{¶ 33}** According to the May 20, 2020 suppression hearing evidence, Detectives Chad Jones and Thomas Cope, both members of the Homicide Unit, were investigating the shootings on December 5, 2019, when they each learned from an FBI agent that Smith was a suspect for both incidents. Detective Cope testified that he shared Smith's name with the lead detectives – Detectives Jones and Steele – but not with the other

detectives because he needed blind administrators for photo spreads.

{¶ 34} Detectives Jones and Cope separately created photo spreads containing Smith's photograph. Detective Cope printed four copies of the one he prepared, placed them in envelopes without the keys (pages identifying the individuals in the photo arrays), and asked Detective Williams, whom he believed to be a blind administrator, to assist with presenting the photo spreads to witnesses. Detective Jones printed two copies of his photo spreads, put each photo array packet in unmarked manilla envelope, and retained the keys to the arrays in his personal binder separate from the packets. He testified that he gave his packets to either Detective Williams or Detective Thomas Cope.

{¶ 35} Detective Williams had been called as a backup detective to assist with the jazz club shooting investigation. He went to that scene to speak to witnesses and to look for digital evidence. While there, the bouncer told him that the shooter was a black male wearing a mask; the manager had not seen anything. Williams stated that he did not find anything indicating who the shooter might have been. The detective also pulled surveillance videos from several locations – the jazz club, the food market, and the nearby Bancroft Apartments – but he did not view the footage of the crime scenes while he was downloading those videos and he did not see the face of the shooter while retrieving the apartment videos. After uploading the videos to the police department's system for detectives to view, Detective Williams drove around looking for a black car associated with the crimes and a pinged cell phone. He also worked on an unrelated case until he was asked to help with photo spreads.

{¶ 36} Detectives Cope and Williams visited three witnesses to have them review

photo spreads. For each witness, Williams marked that he was a blind administrator, and he testified that he did not know the name of the suspect. Detective Williams stated that he never saw the keys to the photo spreads.

{¶ 37} The pair first traveled to Miami Valley Hospital to meet with Earnest, who was shot at the jazz club. Detective Cope introduced himself and Williams to Earnest, told Earnest that he had some photos he wanted him to look at, and then left the room. Detective Williams then read the instructions and presented the photo array. Earnest identified Smith but said "That's my cousin's lil cousin. He was there [at the club] but I know he didn't shoot me." Suppression State's Ex. 4. Detective Cope did not think Earnest's response made Williams no longer "blind," explaining "we get misidentifications all the time."

{¶ 38} The detectives next spoke with Dondray Haynes, a security guard from the jazz club. Detective Williams stated that he did not know which shooting Haynes related to, and he did not look to see if he was showing the same photo spread as before. Williams also still considered himself to be a blind administrator, as his interaction with Earnest did not reveal who the target was.

{¶ 39} Detective Cope knocked on Haynes's door, introduced himself and Detective Williams, and then waited outside by the car while Detective Williams went inside the house. After Detective Williams read the photo spread instructions and presented the photo spread, Haynes also recognized Smith, saying that he had patted him down. Haynes further told Detective Williams that he "walked him [Smith] out and assumed he left in a black car. It left towards Hilltop." Suppression State's Ex. 6.

{¶ 40} Cope and Williams then went to Dwanaesha Nicholson's residence and Cope asked her to look at some photos. Nicholson sat in the front seat of Williams's vehicle while Cope stood away from the car. Detective Williams read the instructions to Nicholson verbatim. After viewing the photo array, Nicholson said, "I see him," became very scared, and asked to speak with Detective Cope. Nicholson did not indicate to Willilams who she was looking at in the photo spread. Detective Williams started gesturing for Detective Cope to come over and told him that Nicholson was hesitant to look at the photo spread and wanted to talk to him.

{¶ 41} Detective Cope got into the back seat behind Detective Williams and asked Nicholson what was going on. Nicholson expressed that she was fearful and that she did not want to put her name on anything because she was afraid of retaliation. Cope asked Nicholson if she saw the person who shot her cousin; Nicholson responded affirmatively. The detective emphasized that she needed to tell them who the shooter was and told her that if she saw the person there, she should circle him, put her initials there, and that would be all they would need for now. Nicholson said she would be okay with that and would come to court to testify. Detective Cope then left the vehicle and went back to talking to the family. After Detective Williams also reassured Nicholson that they would do everything they could to make sure she was safe, Nicholson circled Smith's photo, initialed the page, and told Detective Williams that he was the person who killed her cousin. Suppression State's Ex. 5.

{¶ 42} Cope and Williams both testified that Cope did not suggest that the shooter was in the photo array or do anything to influence Nicholson's selection. Cope stated,

"If she doesn't see anybody in there, she doesn't see anybody in there." Suppression Tr. 48. Detective Williams testified that he did not know which shooting Nicholson was being asked about, and he had marked himself as a blind administrator because he did not know who the suspect was when he presented the photo spread to her. *Id.* at 108, 113. He explained that he did not have any indication that the person identified by Earnest and Haynes was the shooter. *Id.* at 108-109.

{¶ 43} After Nicholson's identification, Detective Cope no longer considered Detective Williams to be a blind administrator.

{¶ 44} On appeal, Smith argues that Detective Williams was not a blind administrator given his involvement in the investigation prior to being asked to assist with the photo spreads, and particularly after the information provided by Earnest and Haynes. He asserts that Williams thus administered several photo spreads in violation of statutory requirements.

{¶ 45} On the record before us, we find no abuse of discretion in the trial court's denial of Smith's motion to suppress the pretrial identifications. Initially, the trial court reasonably rejected Smith's contention that Detective Williams could not be a "blind administrator" due to his involvement in the investigations. Although Detective Williams was actively involved in the investigations, there is nothing in the record to indicate that he was aware of the potential identity of the shooter prior to administering the photo arrays. Detective Williams testified that his conversations with witnesses did not reveal information about the shooter's identity, and he did not view any of the surveillance videos from the jazz club or food market while he was retrieving them. Although he saw video

footage from the apartment's system, he was unable to discern the features of the person depicted in the videos. Williams acknowledged that he also drove through Trotwood looking for a black car and a pinged cell phone before being asked to administer photo spreads, but he maintained that he did not know the identity of the suspect. Nothing in the record demonstrates that Detective Williams knew the identity of the suspect before presenting the photo spread to Earnest, the first witness he and Detective Cope visited.

{¶ 46} The trial court also reasonably determined that Williams remained a "blind administrator" even though he presented the same photographic line-up to three different witnesses. As stated by the Tenth District, "[w]e find no basis in the law to require that a single witness's selection from a line-up confers knowledge of who the suspect is such that the administrator is no longer 'blind' within the meaning of R.C. 2933.83(A)(2)." *State v. Johnston*, 10th Dist. Franklin No. 15AP-512, 2016-Ohio-4553, ¶ 31. We note that this court previously referred to law enforcement officers who have presented multiple photo spreads as "blind administrators," although we recognize that the issue Smith now raises was not then expressly before us. *See, e.g., Shepherd*, 2d Dist. Montgomery No. 29123, 2021-Ohio-4230, at ¶ 17; *State v. George*, 2d Dist. Montgomery No. 24889, 2012-Ohio-3597, ¶ 14.

{¶ 47} Regardless, even if a prior identification by a witness could make an administrator no longer "blind," the identifications by Earnest and Haynes did not cause such a result. Neither Earnest nor Haynes identified Smith as the shooter. Earnest recognized Smith's photograph but told Detective Williams that Smith was his cousin's cousin and he (Earnest) knew that Smith did not shoot him. Earnest's identification

seemingly refuted, rather than supported, a conclusion that Smith was the shooter. Haynes's subsequent identification simply indicated that Smith had been at the jazz club prior to the shooting. Haynes's comments to Detective Williams suggested that Smith may have left the scene. Nothing in the two identifications would have informed Williams that Smith was either Detective Cope's suspect or the actual perpetrator of the offenses.

{¶ 48} Finally, we agree with the trial court that, even if Detective Williams were not a blind administrator, that alone would not require suppression of the identifications. Instead, the "penalty" for failing to comply with R.C. 2933.83 is an instruction that the jury may consider credible evidence of noncompliance in determining the reliability of any witness identification resulting from or related to the photo lineup. *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396, ¶ 16, citing R.C. 29833.83(C)(3).

**B. Evidence from Cell Phone**

{¶ 49} Smith also contends that the trial court erred in not suppressing evidence stemming from the warrantless pinging of his cell phone. He argues that exigent circumstances did not exist to justify obtaining his cell phone's location information without a warrant.

{¶ 50} In *Carpenter v. United States*, 585 U.S. __, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018), the United States Supreme Court held that the government's acquisition of historical cell phone location records spanning a period of 127 days constituted a search under the Fourth Amendment for which a warrant was required. *See also State v. Gause*, 2d Dist. Montgomery No. 29162, 2022-Ohio-2168, ¶ 17. *Carpenter* also recognized, however, that "case-specific exceptions may support a warrantless search of

an individual's cell-site records under certain circumstances." *Carpenter* at 2222. Exigent circumstances include "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Id.* at 2223.

{¶ 51} We have repeatedly affirmed the warrantless pinging of a cell phone under the exigent circumstance exception to the warrant requirement where the police sought to find an armed fleeing suspect following a shooting. *See State v. Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112 (2d Dist.); *State v. Davison*, 2d Dist. Montgomery No. 28579, 2021-Ohio-728, ¶ 14; *Gause* at ¶ 19. Noting that the gravity of the offense is an important consideration in whether exigent circumstances exist, we concluded in *Snowden* that the warrantless pinging of the defendant's phone was justified where the defendant was armed, had shot the victim in front of multiple witnesses, and had fled the scene. *Snowden* at ¶ 37.

{¶ 52} We have no difficulty finding exigent circumstances here as well. When Detective Steele requested the pinging of Smith's phone, detectives had information that Smith had shot and killed two people and injured a third in two separate shootings that occurred seven hours apart. Ten shots had been fired at the first scene and eight shots had been fired at the second. Numerous witnesses had observed both shootings. The second shooting was in broad daylight and appeared to be random. Steele testified that law enforcement officers considered Smith to be a "pretty dangerous person" and they were worried he would shoot someone else. With these circumstances, the trial court did not err in finding that exigent circumstances justified the warrantless pinging of Smith's

cell phone.

**C. Search of Residence**

{¶ 53} Smith next argues that the evidence seized from his Trotwood residence should have been suppressed because the search warrant was not supported by probable cause. He argues that the police relied on information provided by an unnamed informant who was not interviewed by investigating detectives and on identifications made with faulty photo spreads.

{¶ 54} The Fourth Amendment to the United Stated Constitution prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In general, a search must be based on probable cause and executed pursuant to a warrant. *E.g., Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *State v. Moore*, 90 Ohio St.3d 47, 49, 734 N.E.2d 804 (2000).

{¶ 55} Probable cause is a lesser standard than beyond a reasonable doubt or a preponderance of the evidence. *Id.* "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

{¶ 56} Pursuant to Crim.R. 41, a request for a search warrant must be made with an affidavit. "The purpose of the affidavit in support of a search warrant is to provide the magistrate with sufficient information to conclude that probable cause exists to believe that contraband or other evidence of a crime will be found in a particular place." *State v. Taylor*, 82 Ohio App.3d 434, 440, 612 N.E.2d 728, 732 (2d Dist.1992). "While it is

desirable to have the affiant provide as much detail as possible from his or her own knowledge, practical considerations will often require that the affiant rely on information provided by other sources. Since the purpose of the affidavit is not to prove guilt, but only to establish probable cause to search, the affiant may rely on hearsay information." *Franks v. Delaware*, 438 U.S. 154, 167, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In fact, according to Crim.R. 41(C)(2), a finding of probable cause may be based on hearsay – in whole or in part – if there is a substantial basis for believing the source of the hearsay is credible and for believing that there is a factual basis for the information. *State v. Collins*, 2d Dist. Greene No. 2022-CA-40, 2023-Ohio-646, ¶ 11; *see also Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1965), syllabus.

**{¶ 57}** When evaluating the sufficiency of probable cause in a search warrant affidavit, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238-239; *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus (following *Gates*). Ordinarily, the review must be confined to the four corners of the affidavit. *State v. Humphrey*, 2023-Ohio-1834, 216 N.E.3d 109, ¶ 34 (2d Dist.).

**{¶ 58}** On review, an appellate court must accord "great deference" to the magistrate's probable cause determination. *George* at paragraph two of the syllabus. Our role is to ensure that the magistrate had a "substantial basis" for its conclusion that

probable cause existed. *Id.*

{¶ 59} In this case, Detective Steele related in his search warrant affidavit that at approximately 11:00 a.m., he was called to investigate the food market homicide. At the scene, he observed eight .40 caliber cartridge casings and blood where the shooting victim, Brown, had lain. Brown was pronounced dead at the hospital, and another detective observed his autopsy. The coroner confirmed Brown's death was a homicide due to multiple gunshot wounds. Steele described the information obtained by law enforcement officers through witness interviews and video footage from an apartment complex near the scene, which included a description of the clothing the shooter had been wearing.

{¶ 60} Steele's affidavit conveyed how Smith was identified as a suspect. He wrote that he had spoken with FBI Special Agent Buzzard, who said that an informant had contacted him with information about the homicide. The informant told Buzzard that another person, William McIntosh, had witnessed the shooting and told the informant that Smith, also known as "Pooter," was the shooter. McIntosh had also witnessed Smith ultimately leave the area in a black Chrysler 300 after the shooting. Buzzard told Steele that he had had dealings with Smith, that he knew Smith to drive his sister's Chrysler 300, and that Smith stayed in Trotwood off of Salem Bend. Buzzard provided Smith's phone number and license plate. After photo spreads were prepared, Nicholson, a witness to the shooting, identified Smith as the person who shot Brown.

{¶ 61} The affidavit further relayed that Detective Steele had pinged Smith's phone, which showed that he was in the area of the Office Depot store near Salem Bend.

Smith's address was determined to be on Well Fleet Drive in Trotwood and "that was verified through DP&L that was within this ping." However, when officers arrived in the area, the phone's location had moved to an area south of Dayton near Washington Township.

{¶ 62} With the information provided, the judicial officer could have reasonably found probable cause to believe that Smith had shot and killed Brown. Although the initial identification of Smith as a suspect came through a chain of people (McIntosh to the informant to Special Agent Buzzard to Dayton detectives), the source of the information, McIntosh, was identified, and his information was corroborated by Nicholson's identification and additional research. Moreover, given that Smith's cell phone was located in the area of his residence in Trotwood after the shooting, there was probable cause to believe that evidence related to the shooting would be found there. Accordingly, the trial court did not err in denying Smith's motion to suppress evidence found at his Trotwood home.

{¶ 63} Smith's second assignment of error is overruled.

### IV. Disclosure of Confidential Informant

{¶ 64} In his third assignment of error, Smith claims that the trial court erred in overruling his motion for the State to disclose all confidential informants referred to in the search warrant affidavit. He reiterates his arguments made to the trial court that he needed to question the informant to determine the informant's credibility in providing information to the police and whether the informant or someone close to him or her may have been the actual shooter.

{¶ 65} The State has an inherent interest in protecting the confidentiality of its informants. *E.g., State v. Griffith*, 2015-Ohio-4112, 43 N.E.3d 821, ¶ 42 (2d Dist.). Nevertheless, "[t]he identity of an informant must be revealed to a criminal defendant when the testimony of the informant is vital to establishing an element of the crime or would be helpful or beneficial to the accused in preparing or making a defense to criminal charges." *State v. Williams*, 4 Ohio St.3d 74, 446 N.E.2d 779 (1983), syllabus. The burden is on the defendant to show that the need for the informant's testimony outweighs the government's interest in keeping the informant's identity secret. *State v. C.B.*, 64 Ohio St.3d 649, 653, 597 N.E.2d 510 (1992); *State v. McShann*, 2d Dist. Montgomery No. 27803, 2019-Ohio-4481, ¶ 78.

{¶ 66} The trial court reasonably found that Smith did not meet his burden. The search warrant affidavit prepared by Detective Steele made clear that the confidential informant relayed information provided by someone else who had witnessed the Save Food shooting. The informant passed along the identity of the witness (McIntosh) and of the alleged shooter (Smith). There is no indication that the confidential informant had any first-hand knowledge of the shooting, and the State indicated in its opposition memorandum that the informant would not be called as a witness, as any testimony would be inadmissible hearsay. *Accord State v. Deleon*, 131 Ohio App.3d 632, 723 N.E.2d 188 (2d Dist.1999). The fact that the relayed information led to a pretrial identification of Smith by Nicholson and later to the search of his home did not make the informant's identity any more relevant. *See id.* at 635. Finally, Smith's claims that the confidential informant may have been present at his home and planted evidence there are

speculative, at best. As stated by the trial court, there is "literally no evidence to suggest either of these allegations are true."

{¶ 67} In short, the State's interest in maintaining its promise of confidentiality outweighed any interest Smith had in discovering the identity of the confidential informant. The trial court did not abuse its discretion in denying Smith's request for the disclosure of the informant's identity. Accordingly, Smith's third assignment of error is overruled.

### V. Sufficiency and Manifest Weight of the Evidence

{¶ 68} Smith's fourth assignment of error claims that his convictions were based on insufficient evidence and against the manifest weight of the evidence. He emphasizes that no one identified him as the shooter, that the shooters at the two scenes wore different clothing, and that no physical evidence linked him to the crimes.

{¶ 69} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 70} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence

is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.   When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact.   Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 71} Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49.   In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence."   *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

**A. Shooting at Rick's Jazz Club**

{¶ 72} According to the State's evidence at trial, Rick's Jazz Club, located at 1832 Lakeview Avenue, was an after-hours club owned by Rick Barney.   Gregory Payne, Jr., and Amy Hoskins oversaw the club as managers; Hoskins was also the bartender.   The club employed security personnel and had security cameras for both inside and outside

the business.    On December 5, 2019, Dondray Haynes and Michael Reese were working security, and patrons were patted down for weapons before entering the club.    Crowd-control fencing created a short walkway leading to the steps to the front door.

{¶ 73} At approximately 1:05 a.m. (shown as approximately 2:15 a.m. on the surveillance video), Harris drove up to the jazz club, parked in the alley near the front door, and got out.    After speaking with Haynes, Harris was patted down by Reese and then entered the club.    Earnest arrived approximately 30 minutes later, and Dijon Martin, his cousin, came about five minutes after him.

{¶ 74} At approximately 2:50 a.m., a man dressed in stonewashed jeans and a blue hoodie with an Air Jordan logo on the upper left side – later identified as Smith – arrived at the jazz club.    After being patted down, he briefly spoke outside with Martin and Haynes.    Earnest came out, and the three – Earnest, Martin, and Smith – went inside the club and approached Harris.    An argument began almost immediately.    After being alerted about an altercation, Haynes went in and saw that Smith was part of the group arguing, and he escorted Smith outside without incident.    Smith went around the building to the left (west), the direction from which he had initially arrived.    He got into a dark-colored sedan and drove onto Lakeview Avenue.

{¶ 75} Haynes went back inside the club and saw Harris and Earnest continuing to argue.    Harris came outside, and he and Earnest began to fight in the alley to the east of the entrance and Harris's vehicle.    The security officers and Payne attempted to break up the scuffle, and after a couple punches were thrown, Reese employed pepper spray, hitting Harris and Haynes.    Harris ran back toward the main entrance, followed by Reese,

Earnest, and others. Smith, who had driven around to the far east end of the alley as the fight was progressing, got out and walked toward the club not far behind them. Smith donned a mask when he neared the front door. As Earnest had his arms around Harris by the front entrance, Smith walked up and began shooting at close range. Harris and Earnest both fell as other people in the entrance area scrambled away over the barriers. Haynes pulled out his 9mm handgun and fired a shot toward Smith. Smith ran away, down the alley toward his vehicle. Earnest rose and went into the club. Harris remained lying on the ground.

{¶ 76} Shortly after the shooting, Officers Brandon Veregge and David Lane, who were patrolling the area, were flagged down by Reese. They observed Harris lying motionless by the front entrance to the jazz club with multiple gunshot wounds and contacted their sergeant. Harris died from his injuries at the scene, and his subsequent autopsy revealed 11 gunshot wounds, 8 of which were to his back. Earnest, who was shot in the stomach and left thigh, got himself to the hospital, where he underwent surgery.

{¶ 77} A police investigation ensued. Homicide detectives spoke with witnesses at the scene, including Haynes and Hoskins. That morning, Detective Williams obtained the surveillance videos from inside and outside the club, which captured several hours preceding the shooting and the shooting itself. Officer Craig Stiver, an evidence technician, collected ten spent cartridge casings and five spent bullets from the scene, as well as other items. All the casings were made by Hornady and were .40 Smith and Wesson caliber. Detective Walter Steele, the lead detective, went back to the scene

after learning that Haynes had fired a weapon; he found another Hornady .40 Smith and Wesson casing. The police also collected a bullet and bullet fragment that had been removed from Earnest at the hospital. During Harris's autopsy, the coroner recovered multiple bullets and bullet fragments, including red caps (called a Flex Tip) that were part of the bullets.

### B. Shooting at Food Mart

{¶ 78} While the investigation of the jazz club shooting was ongoing, a second shooting occurred at the Save Food Super Market, located behind the jazz club at 1829 Germantown Street. Dwanaesha Nicholson testified that she saw her cousin, Brown, having a heated conversation with someone outside the food mart. When Brown tried to run, he was shot. Nicholson heard several shots and saw a man in a red, white, and blue coat running the opposite way from her, through the DeSoto Bass apartment complex toward the Bancroft Apartments. After the shooting, Nicholson provided a description of the shooter to the police.

{¶ 79} Vanessa Jackson was driving on Germantown Street when she heard about ten gunshots and saw people running away from the food mart, including a man in a red coat who appeared to be the shooter. Jackson turned south onto Oldfield Avenue to get away from the shooting scene, then turned left onto West Stewart Street and left again onto Danner Avenue back toward Germantown Street. As Jackson drove along Danner Avenue, she saw the man cross Danner toward the Bancroft Apartments and take off his coat. Jackson went to the food mart and called 911. She provided a description of the

shooter's clothing and told the dispatcher that he had headed toward the apartments next to DeSoto Bass.

{¶ 80} Police officers responded quickly to the food mart. Officers George Kloos and Joseph Watson performed CPR on Brown until medics arrived. Brown was then transported to the hospital, where he died from his injuries. An autopsy revealed that Brown had suffered 10 gunshot wounds. Six bullets from the incident, including some with red caps, were recovered during the autopsy, along with bullet fragments. A bullet from a prior gunshot wound to Brown's left thigh was also located.

{¶ 81} Officer Stiver processed the food mart scene, where he collected eight Hornady .40 Smith and Wesson cartridge casings and other nearby items. Detective Williams went to the food mart and obtained video from the store, but it only captured the store's interior. Based on the direction that the shooter reportedly fled, Detective Williams also gathered exterior video footage from the Bancroft Apartments office building.

### C. Identification of Smith as the Shooters

{¶ 82} The main issue at trial was the identity of the shooters. Homicide detectives did not have any identified suspect until sometime after the food mart shooting. Detectives Cope and Jones then created photo spreads with Smith's photo. Detective Cope asked Detective Williams, who testified that he did not know the identity of the suspect, to assist him with presenting the photo spreads to witnesses. During the afternoon of December 5, the day of the shooting, Cope and Williams met with Earnest, Haynes, and Nicholson.

{¶ 83} Detective Williams showed the photo spread to Earnest at the hospital. Earnest identified Smith's photograph. Williams wrote that Earnest said, "That's my cousin's lil cousin. He was there but I know he didn't shoot me." State's Ex. 56. Detective Williams wrote "refused" on the portions of the form asking for Earnest's signature and his certainty in the identification.

{¶ 84} At trial, Earnest did not recall being shown the photo spread. He did recall coming to the jazz club with Martin, but in separate vehicles. He also remembered running into Harris at the jazz club and having a few words with him; he said Smith came in later. In the courtroom, Earnest pointed out Smith as the cousin who came to the jazz club later. Earnest further testified that a security guard maced Harris while he (Earnest) and Harris were arguing. Earnest indicated that, back at the front door of the club, he was trying to have a conversation with Harris while Harris was wiping out his eyes when "a bunch of commotion" occurred. Earnest did not remember the shooting itself and said did not realize he had been wounded until he was back inside the jazz club. Upon being shown video footage from the jazz club prior to and up to the shooting, Earnest identified himself, Harris, Martin, and Smith in the videos. Earnest testified that he never saw the face of the person who was shooting. Trial Tr. at 831-832.

{¶ 85} Detectives Cope and Williams testified that they next went to Haynes's residence. Haynes also selected Smith's photo from the photo spread, said that he had patted him down, and expressed he was 100 percent certain of the identification. At trial, Haynes acknowledged that he had made these statements. Haynes also reviewed the video footage from the jazz club and stated that he recognized the person wearing the

blue hoodie with the Air Jordan logo and "blue jeans with white on them" from prior interactions at the club.   Haynes identified Smith in court both as the person wearing those clothes at the club and as the person he circled on the photo spread.   Trial Tr. at 676, 690.   Haynes testified that he had patted Smith down at the jazz club and escorted him out of the club about a minute later.   Haynes stated that the shooter was wearing clothes similar to those worn by Smith.   Trial Tr. at 700.

{¶ 86} Significantly, the State played the surveillance videos from the jazz club, which tracked the arrivals of Harris, Earnest, Martin, and Smith, the departure of Smith following his ejection, the fight between Harris and Earnest, the apparent return of Smith, and the shooting by the front door.   Earnest and Haynes had confirmed Smith's presence and clothing at the club, and the shooter on the video appeared to be wearing the same clothing as Smith.   Although the shooter put on a mask just prior to the shooting, the jury could have reasonably concluded from the videos that Smith was the shooter at the jazz club.

{¶ 87} With respect to the food mart shooting, two videos from the Bancroft Apartments were played for the jury, and five still photographs derived from those videos were admitted into evidence.   State's Ex. 52a; State's Ex. 53c; Ex. 53e.   The first video showed a man running toward Danner Avenue with a coat under his right arm, crossing the street, and then walking on the sidewalk toward the apartment office.   The second video showed the man, now holding the coat in his left hand, walking past the office building.   In both videos and the still photographs, the man appeared to be wearing the same clothing as what Smith had been wearing at the jazz club.

{¶ 88} Nicholson was nearby when the food mart shooting occurred. In a recorded interview at the scene (State's Ex. 48), she said that her cousin was killed right in front of her, and the shooter ran right past her. According to Detectives Cope and Williams, they went to Nicholson's home on December 5, 2019, to show her a photo spread. Cope asked Nicholson to look at some photos and introduced Williams. Nicholson then sat in the detectives' car with Williams, who presented the photo spread. Detective Williams testified that after reading the instructions to Nicholson and showing her the photos, Nicholson became very scared and did not want to complete the process. Williams signaled to Cope, who walked over and got into the back seat. Detective Cope testified that Nicholson had concerns about her name appearing in a discovery packet and having to sign her name. After reassuring Nicholson about her safety and what she needed to put in writing, Cope exited the vehicle and Williams resumed the photo identification process. Nicholson selected Smith's photo and initialed beside the image; she indicated that she was 100 percent certain that he had killed her cousin. When shown a still photograph taken from the Bancroft Apartments surveillance video (State's Ex. 53c) at trial, Nicholson testified that the person leaving the scene appeared to have a coat like the man in the photo was holding. Trial Tr. at 580.

{¶ 89} Jackson, who was called as a defense witness, recognized her car driving down Danner Avenue when shown a video from the Bancroft Apartments. She identified the individual shown in the video, who she saw taking off his coat, as the person she believed was the shooter. Jackson pointed out the same person in still photographs taken from the video. A comparison of the images from the Bancroft Apartment videos

and the jazz club videos supported the conclusion that Smith was the shooter at both locations.

{¶ 90} Ballistic testing, which showed that the same gun had been used at both shootings, further corroborated that the same shooter was involved in both shootings. Robert Burns, a firearm examiner at the Miami Valley Regional Crime Lab, testified that all the casings were Hornady brand .40 Smith and Wesson caliber and were fired from the same weapon.  Burns stated that the characteristics he observed on the cartridge casings were typical of those made by a Glock firearm.  All intact spent bullets were also found to have been fired from the same weapon.  The red caps were consistent with the Flex Tip that Hornady uses on some ammunition.

{¶ 91} While executing a search warrant at Smith's residence on the day after the shootings, Detective Steele located a loaded .40 caliber Glock magazine from Smith's dining room.  Plastic tipped bullets like those used in the shootings, albeit with blue tips on a different caliber bullet, also were found in Smith's residence.

{¶ 92} Finally, there was evidence that Smith had fled following the shooting. Detective Steele testified regarding his unsuccessful efforts to locate Smith after the shootings by having Smith's cell service provider ping his phone.  The detective stated that Smith did not come back to his residence while law enforcement conducted a search there and his phone was turned off soon after.  Steele asked the FBI and U.S. Marshals to continue searching for Smith.  Smith was located in Georgia on January 12, 2020.

{¶ 93} Viewing the evidence in the light most favorable to the State, there was sufficient evidence from which the jury could have concluded that Smith was the shooter

at both the jazz club and the food mart on December 5, 2019.

{¶ 94} At trial, the defense sought to discredit the State's case with evidence that the police conducted an inadequate investigation or used incorrect procedures, that the identifications were unreliable, that the witnesses' memories were faulty, and that there was no evidence connecting him to the crimes. We recognize that additional evidence was presented from which the jury could have reasonably questioned whether Smith was the perpetrator. For example, neither the firearm that was used nor the clothing that the shooter wore was found. Jackson was shown a photo spread and did not select Smith's photograph, although she indicated both then and at trial that she was not certain of her selection. Haynes acknowledged that he did not initially disclose to the police that he had fired his weapon, and there were other possible inconsistencies in his testimony. At trial, Nicholson denied that she saw the shooting itself and testified that the shooter's eyes had stood out from when he ran past her after the shooting. The defense further suggested that Detective Williams's involvement in the investigation made him not a blind administrator when presenting the photo spreads to witnesses. The defense offered the expert testimony of Dr. Melissa Berry, a psychologist and lawyer, about eyewitness identification and memory processes to assist the jury.

{¶ 95} It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Smith had committed the charged offenses. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. Upon review of the evidence, we cannot

conclude that the jury lost its way when it ostensibly credited the State's version of events and found that Smith had committed the shootings at both the jazz club and the food market. Smith's convictions were not against the manifest weight of the evidence.

{¶ 96} Smith's fourth assignment of error is overruled.

### VI. Motion for Mistrial and New Trial

{¶ 97} Smith's fifth assignment of error challenges the trial court's denial of his motions for a mistrial and, alternatively, for a new trial. Smith asserts that two incidents warranted a mistrial: (1) a disturbance involving members of the public who were watching the trial and (2) the alleged viewing of extraneous evidence by the jury during deliberations.

{¶ 98} A mistrial needs to be ordered only when the substantial rights of the accused are adversely affected such that a fair trial is no longer possible. *State v. Howard*, 2d Dist. Montgomery No. 18884, 2002 WL 1332522, *3 (Jun 14, 2002); *State v. Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439 (2d Dist.). An error or irregularity that fails to rise to that level does not warrant a mistrial. *Id.* Similarly, Crim.R. 33(A) authorizes the granting of a defendant's motion for a new trial when the defendant's substantial rights are materially affected by any of six enumerated causes. Those causes include an irregularity in the proceedings that prevented the defendant from having a fair trial and jury misconduct. Crim.R. 33(A)(1) and (2).

{¶ 99} The decisions whether to grant a mistrial or a new trial lie within the sound discretion of the trial court, which we review for an abuse of discretion. *State v. Sutherland*, 2d Dist. Darke No. 2021-CA-16, 2022-Ohio-3079, ¶ 18.

### A. Court Disturbance

{¶ 100} During defense counsel's cross-examination of Officer Stiver on July 28, 2022, three individuals in the gallery either were asked to leave or were escorted out of the courtroom by deputies. After the court had the jury exit the courtroom, defense counsel immediately moved for a mistrial. Counsel explained that he had been informed that someone in the gallery was called out of the courtroom and then arrested. In addition, another person tried to leave but was prevented from doing so by a deputy; when that person finally got out, he also was arrested. Defense counsel expressed concern about what the jury saw, saying, "if the jury saw people being taken out in handcuffs or trying to get out and the door was being stopped from people sitting behind him [Smith], that could be interpreted that it's his [Smith's] family members and people that are supporting him." Trial Tr. at 1003-1004. Counsel also raised that a third attendee, who apparently used her cell phone's camera while in the courtroom, had been ordered to leave the courthouse by a deputy, which counsel asserted was a violation of Smith's right to a public trial.

{¶ 101} The trial court replied that it was facing the gallery, it had seen what occurred, and no one was placed in handcuffs in the courtroom. The judge stated that she was told that someone was placed in handcuffs in the hallway. As to the person who was asked not to return to the courtroom, the court emphasized that it had informed the individuals in the gallery that it had authorized the deputies to enforce the court's rules and that it was up to the deputies whether someone would be asked to leave the courtroom or would be ejected from the courthouse for the duration of the trial. The trial

court stated that it supported the deputies' decisions when rules are broken. The court denied the motion for a mistrial, reasoning that "anything that happened did not happen in the courtroom in the jury's purview." Trial Tr. at 1010.

**{¶ 102}** After defense counsel spoke privately with Smith, defense counsel further raised that Detective Steele, who sat with the prosecutors as the State's representative, had gotten up during the disturbance. Counsel stated that Steele's actions "put the focus on my client because it was Det. Steele who got up from his counsel's table and went on the side of the courtroom of the court * * * where my client's family was and had a person basically ejected from the court." Trial Tr. at 1011. The trial court responded that there was only one deputy left in the courtroom when Steele got up and addressed a person who was asked to sit multiple times but refused to sit down. The court noted that Steele was, first and foremost, a law enforcement officer, "and if he sees something that needs to be taken care of that law enforcement is required to respond to, he has to do that." Trial Tr. at 1012.

**{¶ 103}** The court again denied the request for a mistrial. It emphasized that the situation was created by a rule violation by somebody in the gallery, that law enforcement had to deal with that, and no one was arrested in the jury's presence. The prosecutor corroborated that the courtroom door was not, at any time, open so that the jury could see out. Steele also confirmed that the courtroom door was closed when the first person was handcuffed and that the second person was arrested by the elevator, away from the courtroom door.

**{¶ 104}** We find no abuse of discretion in the trial court's denial of Smith's motion

for a mistrial. "[T]he trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial." *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). *See also State v. Williams*, 73 Ohio St.3d 153, 167, 652 N.E.2d 721 (1995); *State v. Kleekamp*, 2d Dist. Montgomery No. 23533, 2010-Ohio-1906, ¶ 66. The trial court reasonably rejected Smith's assertion that his right to a public trial was denied by the ejection of an individual who violated the court's rules of behavior in the courtroom. Moreover, although the jury apparently saw deputies and Detective Steele require a few attendees to leave the courtroom, no one was arrested in the courtroom or within the jury's view. Nothing in the record suggests that the disturbance adversely affected Smith's substantial rights to the extent that he could no longer receive fair trial.

**B. Jury Misconduct**

**{¶ 105}** After the verdicts were rendered, defense counsel, the prosecutor, Detective Steele, the trial judge, and some of the court's staff spoke with jurors in the jury room. During that conversation, a juror reportedly indicated that a critical piece of evidence in the food market shooting was the Bancroft Apartment video which, according to the juror, showed that something was handed-off to the suspect; the juror said that they had slowed down the video to see it, and the suspect was wearing stone-washed jeans in the video.

**{¶ 106}** On August 10, 2022, five days after the trial concluded, Smith moved for a mistrial or, alternatively, for a new trial on the ground that the jury was not shown a video showing the suspect handing something to anyone during the trial. He thus

claimed that extraneous evidence was improperly submitted to the jury. The motion was supported by an affidavit by defense counsel which described what had occurred while meeting with the jurors.

**{¶ 107}** The State opposed the motion, arguing that there was no evidence that anything improper was provided to the jury or that there were irregularities in the proceedings. Detective Steele indicated in his own affidavit that the only Bancroft Apartment videos that clearly showed an individual with the blue hoodie with an Air Jordan symbol and stonewashed jeans were the ones played at trial; none of the other videos were relevant. As to the jurors' comments, Steele stated that "[a]lthough there was a mention of the suspect in stonewashed jeans interacting with another individual it was not clear whether they were speaking of the Jazz Club video, or the Bancroft video." Jurors also commented on the increased clarity of the videos when viewed on a computer, which several jurors had also mentioned. Steele stated that the jurors had said that their review of the Bancroft Apartment videos, combined with all the other evidence at trial, led to the guilty verdicts.

**{¶ 108}** The trial court agreed that "the jurors advised the main evidence that led to the guilty verdicts was the videos" and that one juror mentioned that there was a part in the Bancroft Apartments video where they saw Smith handing something to another individual. The court noted that, immediately following this comment, the juror then stated that it was the slowing down of the video to see the face of the suspect that led to their verdicts, and that several other jurors had agreed it was the "videos, plural," that led them to find Smith guilty. The trial court denied Smith's motion, reasoning:

Defendant cites cases in which evidence that had been suppressed or specifically excluded was mistakenly sent back the jury. That is not the case here. The Bancroft video was properly authenticated and entered into evidence. The fact that counsel had not viewed, or did not recall, one specific part of the video the jurors found interesting does not constitute a mistrial or warrant a new trial.

{¶ 109} We cannot conclude that the trial court abused its discretion in denying Smith's motion. Although it is unclear which video the juror was referring to when discussing a video of the suspect handing something to someone, there is no evidence that the jury received evidence that was not properly admitted. *Contrast, e.g., Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439. The juror mentioned the Bancroft Apartment videos showing the suspect; those videos were admitted at trial. Moreover, the trial court heard the conversation with the jury and understood that it was the jurors' review of all the videos that led to Smith's conviction. On this record, the trial court reasonably concluded that no jury misconduct affecting Smith's substantial rights occurred.

{¶ 110} Smith's fifth assignment of error is overruled.

### VII. Communications with Jurors

{¶ 111} In his sixth assignment of error, Smith claims that his rights were violated when the trial judge met with jurors on three occasions before deliberations.

{¶ 112} A defendant has a fundamental right to be present at all critical stages of

his or her criminal trial. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Section 10, Ohio Constitution; Crim.R. 43(A); *e.g., State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 83. However, a defendant's absence does not necessarily result in prejudicial or constitutional error. *Grate* at ¶ 83. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." (Emphasis sic.) *Id.*, quoting *Snyder v. Mass.*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 139.

{¶ 113} "[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (Fifth Amendment did not require defendant's presence during trial court's discussion with a juror regarding defendant's sketching portraits of jurors during the trial), quoting *Rushen v. Spain*, 464 U.S. 114, 125-126, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring in judgment).

{¶ 114} "To prevail on a claim of prejudice due to an ex parte communication between judge and jury, the complaining party must first produce some evidence that a private contact, without full knowledge of the parties, occurred between the judge and jurors which involved substantive matters." *State v. Jenkins*, 15 Ohio St.3d 164, 165, 473 N.E.2d 264 (1984), paragraph 13 of the syllabus; *see also, e.g., State v. Zaragoza*,

2d Dist. Montgomery No. 26706, 2016-Ohio-144, ¶ 32. "A statement of the trial court or its official is not substantive if it does not address any legal issues, any fact in controversy, any law applicable to the case, or some similar matter." *Zaragoza* at ¶ 33, quoting *State v. DiPietro*, 10th Dist. Franklin No. 09AP-202, 2009-Ohio-5854, ¶ 17; *see also State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6, ¶ 48.

{¶ 115} Even when a defendant's presence is required, defense counsel's failure to object to the defendant's absence generally results in a waiver of the error, and we review the matter for plain error. *State v. Harris*, 2d Dist. Clark No. 2022-CA-73, 2023-Ohio-3271, ¶ 38. Plain error arises only when, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶ 116} In this case, the trial court spoke with jurors on the first day of testimony after the State had completed its direct examination of Nicholson. The court and parties were aware that a juror needed to leave by 5:30 p.m., but the State had concerns that Nicholson would not return the following day if the cross-examination were not completed that day. After a lengthy sidebar discussion about the available options to ensure Nicholson's appearance and the completion of her testimony, the trial court indicated that it would "inquire of the one juror about the timing, and then, we'll make a decision from there." Trial Tr. at 614.

{¶ 117} The court then told the jury in open court: "I understand that there is a conflict with one of your number that has to leave at 5:30, but I'd like to inquire further about being able to go a little bit later. We're under some situations here that may require

us to go a little bit later tonight, especially maybe not as much other nights, but I'd like to have a conversation myself with the jury back in the jury room. So I'm going to have you guys go back in the jury room, and I'll meet you back there." Trial Tr. at 615.

{¶ 118} Smith's constitutional rights were not violated when the trial court met with the jury without Smith or counsel to discuss that day's scheduling, as his presence was not required for such a discussion. Even assuming, for the sake of argument, that Smith's presence was required, defense counsel did not object to the court's proposed actions during or after the sidebar discussion, and we find no plain error.

{¶ 119} The trial court had another discussion with the jury about "timing and scheduling" following Detective Williams's testimony on Friday, July 29, 2022. The court told counsel outside the presence of the jury, "I want to go back to the jury room and simply ask them if they can stay late on Monday and Tuesday, so that we can get more testimony in. So I'm going to do that real quick, and then I'll meet you guys in chambers. Okay?" No one objected to the court's actions. As with the court's prior meeting with the jury about scheduling, Smith's constitutional rights were not violated by the court's interaction with the jury on July 29 without Smith or his attorney present.

{¶ 120} Finally, Smith asserts that the trial court violated his right to be present when an alternate juror was excused. It appears that Smith is referring to Juror #14, an alternate juror who was dismissed due to financial hardship on July 28, 2022, the third day of testimony. Smith cites to an August 3, 2022 discussion in chambers on whether a different juror should be excused, during which the trial court noted that "the only juror that we have excused [Juror #14] I had her alone. It was just she and I in this room when

she was excused." Trial Tr. at 1799.

{¶ 121} We find nothing in the record to support Smith's contention that his rights were violated by the trial court's ex parte interaction with Juror #14. On July 28, 2022, the trial court and counsel discussed whether Juror #14 should be excused and when she would be notified of the court's decision. After a pause so defense counsel could discuss the juror's situation with Smith, defense counsel indicated that they had no objection to the alternate juror's being excused, but counsel preferred that she be notified at the end of the day. Trial Tr. at 1076. The State also had no objection but asked whether the court would remind Juror #14 that she would not be permitted to talk about the case and that the court would notify her once a verdict had been announced. *Id.* at 1077. The court indicated that it would. The trial court's subsequent discussion with Juror #14 apparently was not on-the-record and happened without counsel or Smith present. However, the parties were aware that the communication would occur, and we find no suggestion that any substantive matter was discussed to Smith's prejudice. Smith has not established that his constitutional rights were violated.

{¶ 122} Smith's sixth assignment of error is overruled.

### VIII. Prosecutorial Misconduct

{¶ 123} Smith's seventh assignment of error claims that his right to a fair trial was violated due to prosecutorial misconduct. He asserts that the prosecutor engaged in misconduct during the State's rebuttal closing argument when she purportedly insulted Smith and his defense counsel and indirectly commented on Smith's decision not to testify.

**{¶ 124}** When reviewing a claim of prosecutorial misconduct, we must determine whether the prosecutor's conduct was improper and, if so, whether that conduct prejudicially affected the defendant's substantial rights. *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 115; *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 109-110, citing *State v. Martin*, 2d Dist. Montgomery No. 22744, 2009-Ohio-5303, ¶ 15. "A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial." *St. John* at ¶ 109; *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Kirkland* at ¶ 115.

**{¶ 125}** In general, prosecutors enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, ¶ 119, citing *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

**{¶ 126}** Prosecutors may not make misleading insinuations and assertions, express personal beliefs or opinions regarding the defendant's guilt, or allude to matters unsupported by admissible evidence. *Id.* at ¶ 119. Closing arguments may be " 'colorful or creative' but not purely abusive, inflammatory, or purely derogatory." *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, 207 N.E.3d 677, ¶ 96. For a

prosecutor's closing argument to be prejudicial, the remarks must be 'so inflammatory as to render the jury's decision a product solely of passion and prejudice.' " *State v. Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, ¶ 126, quoting *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986); *see also, e.g., State v. Smith*, 2d Dist. Montgomery No. 28265, 2019-Ohio-5015, ¶ 52.

**{¶ 127}** We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). "Where it is clear beyond a reasonable doubt that the trier of fact would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his [or her] conviction will not be reversed." *St. John* at ¶ 110.

### A. Insulting Comments

**{¶ 128}** Smith challenges three statements made during the prosecutor's rebuttal closing argument as insulting to defense counsel or Smith. Upon review, we conclude that none of the statements constituted prosecutorial misconduct.

**{¶ 129}** In the first challenged statement, the prosecutor told the jury:

* * * We've spent a very, very long time talking now about pings versus historical data. And you heard from the detective tell you these things, the detective who's been involved in law enforcement for 24 years. And you heard him talk about how historical data works, and how you get the exigent circumstances, and when you have the exigent circumstances, you can make that – that phone company can actively real-time send a message to

that phone – ping it.   And we can find where that phone is in real time. You've heard the other thing phone companies can do is they can give you historical records, where they can tell you which tower it hits off of.   They did those things.   Do you think for one minute that in the city of Dayton, one man was executed, was shot after shot after shot in a crowd in a public place where people are around, and a second man was shot and seven hours later a second person is executed, that these law enforcement officers weren't doing everything they could to get him off the street?

* * * You don't think if there was a way to have found him by his phone, they wouldn't have done it?   He told you they did.   They tried to ping his phone. It got turned off.   *The only evidence that you have that the cell phone – well, the only statements, because it's not evidence, that the cell phone company can track your phone everywhere you go, is from a guy who can't run a video.*

(Emphasis added.)   Trial Tr. at 2072-2074.   Interpreting the prosecutor's statements as an insult against him personally, defense counsel objected to the prosecutor's comment. The trial court sustained the objection.   *Id*. at 2074.

{¶ 130} We agree with defense counsel and the trial court that the prosecutor's negative comment about defense counsel was improper.   However, the isolated comment was not so inflammatory that it deprived Smith of a fair trial.   Moreover, the prosecutor was responding to defense counsel's closing argument that the jury should not believe Detective Steele's testimony regarding how cellular service providers obtain

cell phone location information and the differences between historical information and real-time location.    Defense counsel told the jury:

>    Folks, your cell phone is downloading information right now.    They know where you are, even if you – when you even want to go somewhere.    You see that little red dot, that little red dot showing you on the road where – exactly where you are.    And you haven't touched anything.    It just shows you exactly where you are.    When you want to do a MapQuest, it shows you exactly your location.    Telephone companies, because they have the towers out there, if your phone is on, it will show you that.    They know this.    Your phone's receiving information now.    It's receiving time.    It's receiving weather.    In other words, it has to be located to receive it.    You don't have to do anything, but some of you all know that.    Some may not.

Trial Tr. at 2034.    Although the prosecutor should not have made a denigrating comment about opposing counsel while responding to this argument, the prosecutor properly emphasized that there was no evidence refuting Detective Steele's testimony about what cell phone location information was available from cellular service providers and that defense counsel's argument that different information was available should be rejected.

{¶ 131} Smith further argues that the prosecutor insulted him as she continued her rebuttal closing arguments regarding cell phone location information.    The prosecutor stated:

>    There is zero evidence that they [the police] had the Defendant's Google password[.] * * * The phone company has phone records. Other companies

– he [defense counsel] keeps talking about MapQuest. What is that? That's not your phone company. That doesn't go through Verizon. That doesn't go through T-Mobile. Who does that go through? That goes through Google. There was zero evidence that they had any other evidence to track through a different company. They had phone records. You think you can just send a Google search warrant under Chris Smith. * * * You think you can just send it – give me what you got on Chris Smith. There – and he – and by the way, look at the phone box that matched the phone they were tracking. It's a flip phone. Talking about Snapchat and all these things you're doing. *He's running on a flip phone back in 2019.*

(Emphasis added.) Trial Tr. at 2074-2075. Smith did not object to this statement, and we therefore review it for plain error.

**{¶ 132}** We find nothing insulting or otherwise improper about the prosecutor's pointing out that Smith was using a flip phone in 2019, when the crimes occurred. Detectives had located a box in Smith's apartment for the cell phone they were pinging in an effort to locate the shooter. By commenting that the cell phone was a flip phone, the prosecutor was suggesting that, unlike smart phones, Smith's phone likely did not have the capabilities, apps, or features to provided additional location information. That was a reasonable response to defense counsel's argument, not an insult directed to Smith.

**{¶ 133}** Third, Smith asserts that the prosecutor further insulted defense counsel with the following statement:

There was a suggestion that we didn't put – we didn't put Vanessa Jackson

on to hide her. He can't speculate why we did or didn't put witnesses on. You can't speculate about what witnesses said or didn't say if they were called. *Maybe it was because it was a seven-hour cross-examination of the witness* [apparently referring to defense counsel's cross-examination of Detective Williams]. *Maybe it was because we thought he'd take the bait.*

(Emphasis added.) Trial Tr. at 2075. Smith also did not object to these statements.

{¶ 134} These comments were a direct response to defense counsel's arguments regarding why the State did not call Jackson and the other defense witnesses as part of its case-in-chief. Defense counsel told that jury that the prosecutors were trying to "bamboozle" and hide information from them. Trial Tr. at 2035. While the prosecutor alluded to defense counsel when offering possible reasons for why the State did not call additional witnesses, the prosecutor's argument was neither abusive nor inflammatory, and it did not rise to the level of prosecutorial misconduct.

### B. Comments on Smith's Failure to Testify

{¶ 135} Smith further argues that the prosecutor made several statements during her rebuttal closing argument that indirectly commented on Smith's decision not to testify at trial.

{¶ 136} Smith first argues that the prosecutor improperly commented on his failure to testify when she told the jury that it was "uncontroverted" that Earnest and Smith were cousins. Defense counsel objected to the prosecutor's statement and requested a mistrial, arguing that Smith had no burden of proof and "it was just the same as saying my client did not testify." The trial court overruled the motion.

**{¶ 137}** Direct comments on a defendant's failure to testify violate the Fifth Amendment's self-incrimination clause. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, "[a] reference by the prosecutor in closing argument to uncontradicted evidence is not a comment on the accused's failure to testify, where the comment is directed to the strength of the state's evidence and not to the silence of the accused, and the jury is instructed not to consider the accused's failure to testify for any purpose." *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983), paragraph one of the syllabus; *State v. Hall*, 2d Dist. Montgomery No. 25794, 2014-Ohio-2094, ¶ 22.

**{¶ 138}** The prosecutor's reference here to "uncontroverted evidence" was part of the prosecutor's discussion of Hoskins's testimony and how she "cleared up some things" about other witnesses. Defense counsel had emphasized repeatedly that the police had failed to investigate if Smith was Earnest's cousin, as Earnest had testified. (Earnest had said he was cousins with both Martin and Smith.) The prosecutor pointed out during her rebuttal that Hoskins corroborated that Earnest and Martin were cousins, and the video from jazz club showed them greeting and hugging each other. In saying that "[t]here is zero evidence to suggest that [Earnest] is not a cousin. * * * It's uncontroverted," the prosecutor was addressing the evidence presented at trial regarding the relationships of Martin, Smith, and Earnest. She was not commenting on Smith's failure to testify.

**{¶ 139}** Even if the jury could have interpreted the prosecutor's "uncontroverted" statement as commentary on Smith's failure to testify, the trial court instructed the jury that Smith had a constitutional right not to testify and it was not necessary for him to be

witness in his defense. Trial Tr. at 2108. It further told the jury that "[t]he fact that he did not testify must not be considered for any purpose." *Id.* Moreover, the jury was instructed that closing arguments were not evidence but were designed to assist them in evaluating the evidence. Trial Tr. at 2102. We presume that the jury followed these instructions. *See State v. Wright*, 2d Dist. Montgomery No. 28831, 2021-Ohio-2133, ¶ 51 (appellate courts generally presume that a jury will follow a trial court's limiting and curative instructions).

{¶ 140} Next, Smith asserts that the prosecutor commented on his failure to testify when she said, without objection:

> You can't speculate. You were called to speculate. *You were told, oh, I have information I can't share with you.* I'd love to, but I can't. I'm not going to, not my job. That's speculation. We're here for evidence. That is all an invitation to detour from the evidence. The coroner pictures, oh, they could have disagreed to the coroner pictures, of course, yeah. *I bet he didn't want us to show those coroner pictures.* The coroner pictures would show the carnage that this man did to two people. Of course, they don't want you to see the carnage, but it's not just to show that.

(Emphasis added.) Trial Tr. at 2086.

{¶ 141} In making these statements, the prosecutor again was responding to defense counsel's argument that the State should have brought in additional witnesses to testify that Earnest and Smith were cousins. Defense counsel had argued to the jury: "If that's the truth, find out. Go get some testimony. See, it's not my job to do anything.

I don't have to prove anything. I could have set there. I don't have to say anything. I don't have to disprove anything. But go get some evidence, not bring somebody in here that smokes * * * six blunts a day, had six cognacs. He proud of this. And you going to accept his word, that's my cousin." Through her response, the prosecutor asserted that defense counsel was inviting the jury to reject Earnest's testimony based on speculation. We find no basis to conclude that she was commenting on Smith's decision not to testify.

{¶ 142} As to the prosecutor's rebuttal statements about the coroner's photos, defense counsel had argued that the photos were unnecessary to prove Harris and Brown were killed from gunshot wounds and that the State used the photos to prejudice the jury against Smith. The prosecutor's statement merely acknowledged that Smith reasonably would not want the photos to be shown. She then went on to explain how the autopsy photos and findings demonstrated that the shootings were done by the same person. There was nothing improper about the prosecutor's statements.

{¶ 143} Finally, Smith claims that the prosecutor improperly commented on his failure to testify during her response to defense counsel's argument about the lack of evidence of motive for the jazz club murder. The prosecutor stated, without objection:

No, you know, you haven't heard any motive. You know, the problem with motive is, first of all, it's not a – it's not an element that we ever have to prove. And the problem with murder – motive in a homicide case, it's because he kills the guy who probably could have told us what it was about. You don't get a bonus for that. We don't have to prove it. *The people who would have known what was between them, one of them's dead. The other*

*one's in Georgia.*

(Emphasis added.) Trial Tr. at 2089-2090. The prosecutor's comment was not a comment on Smith's failure to testify. The fact that Smith may have been the only person who could have provided a motive for the killing does not alter this fact. *See Hall*, 2d Dist. Montgomery No. 25794, 2014-Ohio-2094, at ¶ 22.

**{¶ 144}** Smith's seventh assignment of error is overruled.

### IX. Conclusion

**{¶ 145}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HUFFMAN, J., concur.